ATTORNEY FOR APPELLANT
Joseph M. Cleary
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Kelly A. Miklos
Indianapolis, Indiana

# In the
# Indiana Supreme Court



FILED
Oct 28 2008, 12:17 pm

CLERK
of the supreme court,
court of appeals and
tax court

No. 15S00-0611-CR-474

ROBERT J. BASSETT, JR.,

*Appellant (Defendant below)*,

v.

STATE OF INDIANA,

*Appellee (Plaintiff below)*.

Appeal from the Dearborn Circuit Court, No. 15C01-0507-MR-001
The Honorable James Humphrey, Judge

On Direct Appeal

**October 28, 2008**

**Sullivan, Justice.**

Robert Bassett, Jr., appeals his four convictions for murder and sentences of life imprisonment without the possibility of parole primarily on grounds that the prosecuting attorney in this case listened to a number of non-confidential telephone conversations that Bassett had with his lawyer. This conduct did not violate Bassett's legal rights or prejudice him at trial. We affirm the convictions and sentences.

**Background**

Bassett was convicted of the 1998 murders of Jamie Engleking, her two little children, J.B. (age 2) and B.E. (less than one year), and the daughter of a friend of Jamie Engleking, A.D. (age twelve). He was sentenced to four consecutive terms of life without parole. In an earlier appeal, this Court found that hearsay evidence and testimony about the Bassett's prior criminal acts had been improperly presented to the jury and reversed his convictions. Bassett v. State, 795 N.E.2d 1050, 1051 (Ind. 2003). Bassett was tried a second time and the jury again convicted him on all four counts. He was again sentenced to life without parole on each count. The sentences were predicated on the aggravating circumstances that Bassett committed multiple murders,[1] that he was on parole at the time of these murders,[2] that J.B. was less than twelve years old at the time she was killed,[3] and that B.E. was less than twelve years old at the time he was killed.[4]

Pending the resolution of his charges, the record shows that he was housed at the Bartholomew County Jail from November, 2003, to November, 2005. During this time period, Bassett's attorney, Ross Thomas, visited him at least eleven times. Inmates could also call their attorneys using the jail's automated phone system, which recorded all outgoing calls with a warning to both speakers that their conversations were subject to being recorded. The recipients of the calls were then given the option of paying for or refusing the calls.

Although Chief Deputy Prosecutor Kathleen Burns had principal responsibility for Bassett's case, Prosecuting Attorney Bill Nash was actively involved and served as her co-counsel at trial. After taking the deposition of State witness Jimmy Wiles, Burns reported to Nash her concern that Bassett was using his attorney to threaten and intimidate Wiles. Evidence, later used at trial, had also accumulated that Bassett had attempted to hire a hit man to kill Burns herself. In light of these developments, Nash decided to investigate the alleged intimidation of

---

[1] Ind. Code § 35-50-2-9(b)(8) (Supp. 2007).

[2] Id. § 9(b)(9)(D).

[3] Id. § 9(b)(12).

[4] Id.

2

Wiles by requesting the jail's recordings of Bassett's outgoing calls. Nash reviewed nine conversations between Bassett and Thomas, his attorney, before concluding that there was no evidence in the recordings that suggested a conspiracy to intimidate Wiles or any other witness. Nash did not review any other recorded phone conversations between Bassett and Thomas.

Bassett and Thomas were not aware that Nash had reviewed some of their conversations until Nash inadvertently mentioned it to Thomas during a sidebar near the conclusion of the trial. Thomas moved for a mistrial on this basis but the motion was denied. The trial court also denied Bassett's motion to correct error on this basis following a hearing.

Bassett appeals on the following grounds: (1) Nash's review of Bassett's telephone conversations with Thomas constituted an interference with Bassett's attorney-client relationship warranting reversal of his convictions; (2) the trial court committed reversible error when it permitted certain evidence to be introduced during the trial; (3) the trial court committed reversible error when it refused to permit two defense witnesses to testify; and (4) Bassett's sentence of life without possibility of parole should be reversed.

We have jurisdiction over this direct appeal under Ind. Appellate Rule 4(A)(1)(a) because a sentence of life without possibility of parole has been imposed under I.C. § 35-50-2-9.

**Discussion**

**I**

Bassett argues that the State violated his right to counsel under the Sixth Amendment of the United States Constitution and article I, section 13 of the Indiana Constitution by "purposeful[ly] and deliberate[ly] interfer[ing] with confidential attorney-client communications." (See App. 377-78.) He also contends that Nash's actions constituted prosecutorial misconduct in violation of the Indiana Rules of Professional Conduct. Bassett maintains that the remedy for these violations is reversal of his convictions and sentences, and remand for a new trial.

3

## A

The Sixth Amendment guarantees all criminal defendants the right "to have the assistance of counsel for his defense." U.S. Const. amend. VI.[5] Similarly, article I, section 13, of the Indiana Constitution provides that in "all criminal prosecutions, the accused shall have the right . . . to be heard by himself and counsel." Ind. Const. art. I, § 13(a). In order to encourage clients to share information openly with their attorneys and thereby facilitate more effective assistance of counsel, common law courts created the attorney-client privilege. Although the Sixth Amendment right to counsel is distinguishable from the attorney-client privilege, the two concepts overlap. "The fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful." United States v. Levy, 577 F.2d 200, 209 (3d Cir. 1978).

From the earliest days, this Court has held "that when an attorney is consulted on business within the scope of his profession, the communications on the subject between him and his client should be treated as strictly confidential." Jenkinson v. State, 5 Blackf. 465, 466 (Ind. 1840), quoted in Colman v. Heidenreich, 269 Ind. 419, 381 N.E.2d 866, 869 (1978). However, "[t]he burden of proof is on the person asserting the privilege to show that the consultation was a professional one." Colman, 381 N.E.2d at 869 (citations omitted). More recently, this Court has held that

> [t]he essential prerequisites to invocation of the privilege are to establish by a preponderance of the evidence (i) the existence of an attorney-client relationship and (ii) that a confidential communication was involved. To meet the burden of showing that an attorney client relationship existed, the [party asserting the privilege] had to, at the very least, establish that the communication at issue occurred in the course of an effort to obtain legal advice or aid, on the subject of the client's rights or liabilities, from a professional legal advisor acting in his or her capacity as such.

Mayberry v. State, 670 N.E.2d 1262, 1266 (Ind. 1996) (citations omitted).

---

[5] The Sixth Amendment's right to counsel is made obligatory upon the States by the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335 (1963).

A communication is confidential if it "occurred during an attempt to procure professional legal aid." Id. (citation omitted).

When the prerequisites for invoking the privilege have been satisfied, "[t]he burden then shifts to the party opposing the assertion of the attorney-client privilege to show that the communications were not protected by the privilege because the confidentiality was waived or otherwise nullified." Corll v. Edward D. Jones & Co., 646 N.E.2d 721, 726 (Ind. Ct. App. 1995).

The proper application of these principles is illustrated by Lewis v. State, 451 N.E.2d 50 (Ind. 1983). In Lewis, a police officer was permitted to testify at trial to the substance of a conversation regarding defense strategy that he overheard between defendant Lewis and his attorney. Id. at 54. On appeal, Lewis argued that this testimony was inadmissible because the communication was protected by the attorney-client privilege that he had not knowingly waived. Id. at 55. The trial court had determined that the conversation was not confidential, and therefore not privileged, because the defendant and his attorney were in close proximity to the officer when they had the conversation, and they spoke in normal voices. Id. This Court affirmed, holding that "[u]nder these circumstances it cannot be said that the communication was confidential." Id. In holding that the conversation was not confidential, despite the fact that it clearly was intended to be, this Court placed the responsibility squarely on the shoulders of the defendant to safeguard the confidentiality of his communications with his attorney.

In our case, it is undisputed that attorney Thomas and defendant Bassett had an attorney-client relationship. In fact, Thomas visited the Bartholomew County Jail for private consultations with Bassett about his pending trial at least eleven times. Bassett also called Thomas on multiple occasions to talk about his pending trial. There is no question that their communications during Thomas's visits to the jail were confidential and therefore privileged, since "[t]he Bartholomew County Jail provides a conference room that is secure and unmonitored, where inmates may meet with their attorneys for private consultations." (App. 435, ¶ 4.) At no time did either Bassett or Thomas complain to jail staff or officials that they were not provided sufficient opportunity for private and confidential meetings at the jail.

5

However, communications made during Bassett's telephone calls from the jail were not confidential and therefore were not privileged. The jail's automated system warned Bassett every time he made an outgoing call to Thomas that their conversation was subject to being recorded. Thomas was also warned by an automated message that stated, "This is Cincinnati Bell with a collect call from the Bartholomew County Jail from _____. This call may be recorded." (App. 438, ¶ 20.) Clearly Thomas knew that law enforcement personnel might listen to or review his calls, as law enforcement personnel who are not acting as government lawyers are permitted to do. In addition to the warnings, Bassett and Thomas also explicitly acknowledged an awareness that their conversations were not confidential, as demonstrated by their self-censorship in the following recorded conversation:

• Bassett: "I got a couple of things, but I don't know if I ought to say it over this phone or not."

• Thomas: "Well, okay. Well, just don't then."

• Bassett: "Something that might be important to us. Something you told me about [   ]. Something he said."

• Thomas: "Yeah."

• Bassett: "Anyway, uh . . . I don't know. Just something you might need to know about."

• Thomas: "Okay. Well, we'll talk soon. Um, better not to talk on the telephone if we have any . . . concern at all, 'cause there's no need to. So, um, I will, uh, um . . . Well, let's see. What's tomorrow look like? I might be able to run by there in the morning actually, um, depending on what my schedule ends up with today. So, um, if I don't see you tomorrow, then I'll come by next week."

(App. 439, ¶ 23.)

Despite this awareness that their conversations were not confidential, at no time did either Bassett or Thomas request that their phone conversations over the jail's automated system not be recorded or reviewed. At no time did either Bassett or Thomas request that they be provided with a confidential line of telephone communication. Here, like the defendant in Lewis, Bassett failed to safeguard the confidentiality of communications with his attorney. Unlike Lewis, who

6

did not know that his conversation was being overheard by a police officer and quieted down after becoming aware of his presence, Bassett knew that his conversations were subject to being recorded and yet had them anyway. Despite his self-censorship during the calls, Bassett voluntarily discussed several issues related to his pending trial with his attorney.

Bassett's decision to proceed with calls to his attorney after receiving the automated warnings and understanding their implications constituted a knowing waiver of the attorney-client privilege. The telephone communications to his attorney from jail were not protected by the privilege and were not confidential. Since these communications were not confidential, the State did not violate Bassett's Sixth Amendment or article I, section 13 right to counsel when it reviewed recordings of them before trial.

**B**

A claim for relief on appeal in a criminal case can be grounded in prosecutorial misconduct at trial. See Cooper v. State, 854 N.E.2d 831, 835 (Ind. 2006). In addition to Bassett's contention that the prosecutor's reviewing recordings of his telephone conversations with his lawyer violated his constitutional rights, Bassett also argues that it constituted prosecutorial misconduct. The determination of whether a prosecutor in fact engaged in misconduct is made "by reference to the case law and the disciplinary rules of the Code of Professional Responsibility as adopted in this State." Hernandez v. State, 563 N.E.2d 560, 561 (Ind. 1990) (citing Maldonado v. State, 265 Ind. 492, 355 N.E.2d 843, 848 (1976)).

Indiana Professional Conduct Rule 3.8, comment 1, provides: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice . . . ." In a similar vein, we have said of Prof. Cond. R. 8.4(d), which proscribes conduct prejudicial to the administration of justice:

> The duty of prosecutors to conform their behavior to the law does not arise solely out of their status as attorneys. As officers charged with administration of the law, their own behavior has the capacity to bolster or damage public esteem

> for the system. Where those whose job it is to enforce the law break it instead, the public rightfully questions whether the system itself is worthy of respect. The harm done is to the public esteem for those charged with enforcing the law.

In re Winkler, 834 N.E.2d 85, 89 (Ind. 2005) (quoting In re Seat, 588 N.E.2d 1262, 1264 (Ind. 1992)).

At the same time, we recognize that the prosecutor's motivation in listening to the recordings was the investigation of possible criminal activity – and not just any criminal activity but the threat of harm to his own chief deputy. This is not a disciplinary proceeding and, therefore, it is not necessary for us to decide whether the prosecutor committed misconduct unless the prosecutor's conduct caused Bassett undue prejudice. Said more precisely, a defendant is entitled to relief only if "the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected." Cooper, 854 N.E.2d at 835 (citation omitted). "The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." Id. (citation omitted).

In his submissions to this Court, Bassett has not offered any arguments about the probable persuasive effect of the alleged prosecutorial misconduct on the jury's decision. He instead contends that "the very act of invading the attorney-client relationship placed him in a position of great peril,"[6] and that the remedy for this violation is reversal of his conviction and a remand for a new trial.

The United States Supreme Court once employed a per se rule similar to that advocated by Bassett. O'Brien v. United States, 386 U.S. 345 (1967); Black v. United States, 385 U.S. 26 (1966). But the Supreme Court's more recent treatment of government intrusions, Weatherford v. Bursey, altered the approach of Black and O'Brien and explicitly rejected any per se rule concerning intrusions into confidential attorney-client meetings about an ongoing prosecution. 429 U.S. 545, 550-52 (1977).

---

[6] Br. of the Appellant at 27.

The closest analogy in this Court's cases is probably <u>Malinski v. State</u>, 794 N.E.2d 1071 (Ind. 2003). During discovery, detectives removed Malinski's personal belongings from his jail cell and photocopied papers from these belongings. The deputy prosecutor was notified of the detectives' actions, but he did not notify Malinski's lawyers until several months later. <u>Id.</u> at 1080. Malinski moved to dismiss, alleging that the State interfered with his Sixth Amendment rights by "surreptitiously copying his legal documents." <u>Id.</u> After <u>in camera</u> review of the documents, the trial court found that they "do not contain any major revelations of defense strategy from which the State would gain a significant advantage." <u>Id.</u> at 1081. The trial court then sanctioned the State by prohibiting its use of any of the copied documents for any purpose during the trial. <u>Id.</u> On appellate review, this Court concluded that the "trial court's remedy seems to have innoculated Malinski from any governmental misconduct" and that "the State did not gain any significant advantage from copying Malinski's documents." <u>Id.</u> at 1082. We held that "[a]bsent a demonstrable or substantial threat of prejudice on the criminal proceedings, there is no basis for imposing a new trial as a remedy." <u>Id.</u>

Our approach in <u>Malinski</u> accords with that which we have used in cases of prosecutorial misconduct generally. <u>See</u> <u>Coleman v. State</u>, 750 N.E.2d 370, 374-75 (Ind. 2001) (any error from prosecutor's alleged misconduct was harmless because there was overwhelming independent evidence of guilt); <u>Stephenson v. State</u>, 742 N.E.2d 463, 485 (Ind. 2001) ("Having found that any prosecutorial impropriety which may have occurred was <u>de minimus</u> or otherwise overcome by the trial court's admonishments and instructions, we are unable to conclude that Defendant was placed in grave peril." (emphasis in original)).

In sum, there is no <u>per se</u> rule that requires reversal even if we were to conclude that there was prosecutorial misconduct here. The usual rules for appellate relief in cases of prosecutorial misconduct apply, that is, whether the defendant has been put in a position of grave peril to which he or she would not have been subjected. Sufficient independent evidence of guilt and appropriate trial court management of the misconduct have been found to keep some defendants who have been the victims of prosecutorial misconduct from such peril.

9

In our case, Bassett's attorney Thomas moved for a mistrial after discovering that Prosecutor Nash had listened to phone calls between him and his client. As noted above, Bassett does not identify any information obtained by the prosecutor that directly or indirectly was used to his detriment. Our independent review of the record finds only one instance that arguably falls into this category, that is, only one incident related to the telephone calls that could possibly have placed Bassett in a position of grave peril to which he would not have otherwise been subjected.

Here are the details of that incident. During trial, the State attempted to discredit a defense rebuttal witness named Mark Neville by connecting Neville with a man named Everroad, a convicted murderer. The State had been alerted to a connection between Neville and Everroad from one of the conversations between Bassett and his lawyer that Prosecutor Nash had reviewed. This came to light during a sidebar discussion among Nash, Bassett's lawyer, and the court. In this discussion, the State requested permission to cross-examine Neville regarding a statement Neville had purportedly filed on behalf of Everroad in another proceeding.

The crux of the matter, then, is whether the information that the State learned from the telephone calls about Neville's connection with Everroad was deployed in a way that placed Basset in a position of great peril to which he would not otherwise have been subjected. As was just mentioned, the State wanted to use this information to undermine the credibility of Neville who had testified on Bassett's behalf. For at least two reasons, neither the information that the State had nor the way it used it had any "probable persuasive effect on the jury's decision."

First, the State was not allowed to use very much of this information to discredit Neville. The trial court allowed the State only "very limited questioning of Mr. Neville regarding his having provided a statement in another proceeding . . . ." (App. 441, ¶ 31.) And it "did not allow the State to identify Mr. Everroad by name or to reveal the crime of which he had been convicted." Id. Second, Neville's testimony was discredited by other evidence the propriety of which is not subject to any question – the testimony of a witness named Clara Ryan that contradicted Neville's testimony in every relevant aspect. Given that the information the State learned from the telephone calls was only put to extremely limited use in discrediting Neville

and that Neville was also discredited by the separate testimony of Ryan, we conclude that neither the information that the State had nor the way it used it harmed Bassett or put him in grave peril because it did not have any "probable persuasive effect on the jury's decision."

## II

Bassett contends that the trial court committed reversible error when it permitted the following evidence to be introduced during the trial: (a) testimony from two witnesses, Clarence Johnson and Jimmy Wiles, and also from Johnson's wife, Lisa Johnson, that Bassett had threatened the life of deputy prosecuting attorney Burns; (b) conditions of his parole that restricted his establishing a romantic relationship with another person; (c) testimony that Engleking had taken a pregnancy test and that it was positive; and (d) testimony from a witness, Karen Carroll, regarding Bassett's relationship with Jamie Engleking.

## A

Clarence Johnson and Jimmy Wiles were incarcerated in the Bartholomew County Jail during a portion of the time that Bassett was there. At trial, both Johnson and Wiles testified that Bassett had asked them to kill Burns for him. Bassett contends that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice and so violated Evid. R. 403. In addition, Johnson's wife, Lisa Johnson, testified that while he was in jail, her husband had told her of Bassett's desire to have Burns killed. Bassett contends that this testimony was inadmissible hearsay in violation of Evid. R. 801.

The State maintains that Bassett's claims with respect to Clarence Johnson's and Jimmy Wiles's testimony are not available for appellate review because defense counsel did not lodge a timely and proper objection. Our review of the record indicates that there was an adequate objection to preserve these claims for appeal. But the claims are not availing.

There is a long-standing line of cases holding that "threats against potential witnesses as attempts to conceal or suppress evidence are admissible as bearing upon knowledge of guilt."

West v. State, 755 N.E.2d 173, 182 (Ind. 2001) (citation omitted).  These cases include ones in which a prosecuting attorney and an investigating police officer were the targets of the threats. Johnson v. State, 472 N.E.2d 892, 910 (Ind. 1985) (prosecuting attorney); Neal v. State, 659 N.E.2d 122, 124 (Ind. 1995) (investigating police officer), abrogated on other grounds by Richardson v. State, 717 N.E.2d 32, 49 (Ind. 1999).  The testimony of Clarence Johnson and Wiles falls within this category and was properly admitted.

As noted, Bassett contends that the testimony of Lisa Johnson constituted inadmissible hearsay.  The State maintains that the evidence was properly admitted to rebut Bassett's claim that Clarence Johnson had fabricated his testimony about Bassett asking him to kill Burns.  Lisa Johnson testified that Clarence Johnson had told her of Bassett's request of him immediately after the request was made.

Ordinarily, Lisa Johnson's testimony concerning what Clarence Johnson told her that Bassett had said to him would be considered hearsay: an out-of-court statement offered in evidence to prove the truth of the matter asserted.  Evid. R. 801(c).  But a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony, offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, and made before the motive to fabricate arose."  Evid. R. 801(d)(1)(B).  The State argues that Lisa Johnson's testimony falls within the ambit of this rule.

Clarence Johnson did testify at trial and was subject to cross-examination concerning his allegation against Bassett.  Lisa Johnson's testimony was consistent with Clarence Johnson's and was offered to rebut an express charge by Bassett that Clarence Johnson's testimony was fabricated.  With this much, Bassett agrees.  But Bassett argues that the final requirement of the rule – that Clarence Johnson's statement to Lisa Johnson was "made before the motive to fabricate arose" – has not been satisfied.

This Court wrote at some length in Stephenson v. State about the determination of when a motive to fabricate has arisen.  742 N.E.2d at 475 (citing Cline v. State, 726 N.E.2d 1249, 1253

12

(Ind. 2000) and <u>Sturgeon v. State</u>, 719 N.E.2d 1173, 1178-80 (Ind. 1999)). The bottom line on this authority is that in situations where there is no evidence tending to implicate the declarant in the crime, the question of when the motive to fabricate arose is a sufficiently fact-sensitive inquiry (in contrast to situations in which the declarant is implicated in the crime when a motive to fabricate likely arises immediately upon the commission of the crime) that we will defer to the trial court's decision whether or not to admit the statement. <u>See</u> <u>Stephenson</u>, 742 N.E.2d at 475. There is no evidence in this case implicating Clarence Johnson in any way in the murders of Engleking and the children. We affirm the determination of the trial court that Clarence Johnson's statement to Lisa Johnson was made before the motive to fabricate arose.

**B**

Bassett had been released from prison in May, 1998, and placed on parole with several conditions prohibiting him from engaging in an intimate or sexual relationship with another person without permission from his parole officer as well as limiting him from contact with minor children. It was part of the State's theory of the case that Bassett murdered Engleking and the children to conceal the fact that he had violated parole by having an intimate relationship with her and contact with her children. In furtherance of this theory, the State presented the conditions of Bassett's parole to the jury. Bassett contends that the use of this evidence constituted reversible error for three reasons: that there was insufficient evidence supporting an intimate or romantic relationship to allow the parole conditions into evidence; that the parole conditions were irrelevant in terms of establishing motive; and that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

Our review of the record indicates that the evidence was sufficient to establish that Bassett and Engleking had engaged in an intimate and sexual relationship during the summer of 1998. This evidence consisted of Bassett's admissions to several individuals that he was dating or engaged in a sexual relationship with Engleking; phone records showing numerous calls between Engleking's residence and Bassett's residence; and the testimony of various friends and neighbors that they had seen Bassett and Engleking together in a number of different settings.

13

As to motive, it is true that Bassett did advise his parole officer of a relationship with another woman without his parole having been revoked. But this does not make the motive the State asserted here irrelevant. It was certainly within the State's prerogative to argue that the fact that Bassett was in a second relationship that violated the conditions of parole created an even stronger motive for him to conceal his actions.

Certainly there was some risk here that the jury would speculate about the reasons Bassett was subjected to these conditions. But we do not see the risk of unfair prejudice rising to the level of substantially outweighing its probative value. A witness, James Hatton, testified at trial that Bassett admitted to him that he had killed Engleking after the two engaged in a heated argument over her desire to make their relationship public because she was pregnant and his desire to keep it private because it violated the parole conditions. The nature of the parole conditions, then, not only were central to the State's theory of motive but also helped corroborate Hatton's testimony. And the court went to some length to redact portions of the parole conditions exhibit to show only those conditions relevant to motive.

### C

At trial, there was evidence that following Engleking's disappearance, the manager of the apartment complex where Engleking lived found several pregnancy tests in her home. Later, the manager returned with a friend. Both the manager and the friend testified at trial that one of the pregnancy tests was "positive," i.e., that the person who took the test was pregnant. (Tr. 1168-69, 1172.) Bassett contends that the testimony with respect to the pregnancy tests was inadmissible on several grounds. He points out that there was no proof that the test was Engleking's at all (the test itself was not admitted into evidence) or, if so, when it had been taken. (As noted, Engleking had two very young children at the time.) He makes an argument that the test was not relevant to motive. And he contends that portraying Engleking as having been pregnant when she was killed engendered unwarranted sympathy for her that unfairly prejudiced Bassett's case.

We believe the key here is Hatton's testimony that Bassett told him he had killed Engleking after the two had engaged in a heated argument over her desire to make their relationship public because she was pregnant and his desire to keep it private because it violated

the parole conditions. This made evidence that she was pregnant relevant to the issue of motive. Although the absence of the test itself makes the foundation for the testimony shaky, the fact that Engleking was the only adult living in the apartment combined with the fact that two separate witnesses testified to seeing the test in the apartment make it adequate. And we believe that the probative value of further corroboration of Hatton's testimony is such that it is not substantially outweighed by the danger of unfair prejudice. While there might have been some additional sympathy for Engleking on the jury's part if it thought she was pregnant, we see it as being only marginally more than it would already have been for the young mother of two very young children.

**D**

One of the State's witnesses who testified at trial that she believed Bassett and Engleking were engaged in an intimate relationship was a woman named Karen Carroll, a friend of Engleking. Following vigorous cross and re-cross-examination, the State was permitted to ask Carroll whether, in 2001, she had indicated under oath that she believed Engleking and Bassett "were having a relationship." (Tr. 1159.) Carroll answered in the affirmative. (The 2001 statement was made at Bassett's first trial but there was no reference to that trial in front of the jury in this case.) Bassett contends that this evidence was inadmissible hearsay.

The State argues here that Carroll's statement at issue was not offered to prove the truth of the matter asserted or as substantive evidence but rather as non-substantive evidence to rehabilitate her after Bassett's cross and re-cross examination of her. "When prior statements are used to impeach and rehabilitate a witness they are not hearsay because they are not used to prove the truth of the matter asserted." Birdsong v. State, 685 N.E.2d 42, 46 (Ind. 1997) (citations omitted). Does Evid. R. 801, which prohibits the use of hearsay as substantive evidence, foreclose the use of such statements for nonsubstantive, i.e., rehabilitative purposes?

This court has never addressed this precise issue but the Court of Appeals has. In language we find highly persuasive, Judge Kirsch began by observing that where the Indiana Rules of Evidence do not cover a specific issue, common or statutory law applies. Evid. R.

101(a). Moreland v. State, 701 N.E.2d 288, 292 (Ind. Ct. App. 1998). Looking to pre-rules cases, he cited this Court's opinion in Thompson v. State, 223 Ind. 39, 58 N.E.2d 112, 112 (1944), which held that prior consistent statements were admissible on rebuttal where a witness's statements had been impeached by prior contradictory ones. Id. He also cited a Federal Court of Appeals decision to the same effect. Id. (discussing United States v. Ellis, 121 F.3d 908 (4th Cir. 1997), cert. denied, 522 U.S. 1068 (1998)). And he quoted Judge Miller's treatise:

> If an adversary has made an express or implied charge against the witness of recent fabrication or improper influence or motive, and the prior consistent statement was made before the motive to fabricate arose, the prior consistent statement is admissible as substantive evidence; if the prior consistent statement was made after the motive to fabricate arose, however, it is only admissible to rehabilitate the witness.

Moreland, 701 N.E.2d at 293 (quoting 13 Robert L. Miller, Jr., Indiana Evidence § 613.208 (1995)). On the basis of this authority, Judge Kirsch concluded that "the adoption of Rule 801 did not replace the admissibility of prior consistent statements to rehabilitate a witness, but merely allowed a certain subset of these statements to be used as substantive evidence of the truth of the matter asserted." Moreland, 701 N.E.2d at 293.

We adopt Judge Kirsch's opinion in Moreland on this issue and hold that Carroll's prior consistent statement was admissible following cross and re-cross-examination to rehabilitate her testimony.

### III

Bassett contends that the trial court committed reversible error when it refused to permit two defense witnesses, Bruce Brown and Dr. Nancy Scott, to testify. Bassett has argued that his inability to question these witnesses deprived him of his right to present a defense to the charges against him in violation of the Due Process Clause of the 14th Amendment of the U.S. Constitution. We find no violation of Bassett's rights.

During the course of the trial, there was some suggestion that Engleking suspected that her two-year-old daughter, J.B., had been molested. Engleking arranged for J.B. to be examined

16

by a physician, Dr. Nancy Scott.  Dr. Scott testified at trial that she examined J.B. and the examination was "normal."  (Tr. 2841.)

Bassett contended at trial that the various references to J.B. having been molested implied that he, Bassett, was the perpetrator.  As such, he sought the testimony of Dr. Scott to the effect that Engleking believed that Bruce Brown (J.B.'s father) had molested J.B.  He also sought to put Bruce Brown on the stand to accomplish the same effect.

It is important to note that Bassett's claim here is peripheral to his guilt or innocence.  He makes no suggestion that Bruce Brown committed the killings for which Bassett was on trial but only that, to the extent that there had been reference in the trial to the possibility that J.B. had been molested, Bruce Brown was the perpetrator.

From our reading of the record, the evidence presented at trial clearly showed that Engleking suspected Bruce Brown and not Bassett of molesting J.B.  At no point that we can see did the State or any witness directly or indirectly accuse Bassett of being the person suspected of molesting J.B.  In point of fact, the State alluded to Bruce Brown in this context during closing argument.

The testimony that Bassett sought to solicit from Bruce Brown and Dr. Scott was simply cumulative of evidence already before the jury and was at most only peripheral to Bassett's defense.  The trial court was, therefore, well within the discretion that it enjoys with respect to the admission of evidence when it excluded the testimony.

**IV**

Bassett asks that his sentences of life without possibility of parole, imposed for each of the four murders of which he was convicted, be reversed.  Only one of his three claims in this regard warrants discussion.[7]  It is that the jury should not have learned of his prior convictions for child molesting.

---

[7] Bassett's other two claims with respect to his sentence are that the trial court committed fundamental error when it permitted the State to waive its opening statement during the penalty phase of his trial and that this Court should

17

To put Bassett's claim in context, the Indiana statute authorizing a sentence of life-without-possibility-of-parole, I.C. § 35-50-2-9, requires the State to prove the existence of one or more "aggravating circumstances" specified in its subsection (b). One of those aggravating circumstances is that the "defendant was . . . on parole at the time the murder was committed." Id. § 9(b)(9)(D). As part of its proof for this aggravating circumstance, the State offered as an exhibit a written order from a previous proceeding sentencing Bassett for three counts of child molesting. Additional evidence demonstrated that he was on parole after serving those sentences when he killed Engleking and the three children.

Bassett argues that the exhibit was not needed to prove the aggravating circumstance that he was on parole at the time of the murders. But he did not object at the time the exhibit was offered and so has waived his right to appellate review. Absent objection, we think it appropriate for the State to have used evidence of the convictions to help lay the foundation for proving that Bassett was on parole and also to help establish the weight to be given to this aggravating circumstance.

Bassett does not contend that the sentences imposed were inappropriate, either in light of the nature of the offenses or of his character. As such, we elect not to review his sentence further.

**Conclusion**

We affirm the judgment of the trial court.

Shepard, C.J., and Dickson, Boehm, and Rucker, JJ., concur.

---

revisit its holding in Helsley v. State, 809 N.E.2d 292 (Ind. 2004), that the requirement in the life-without-parole statute directing a judge to follow the sentencing recommendation of the jury is constitutional. It is not error, fundamental or otherwise, for the State to waive its opening argument. As to the constitutionality of the statutory direction that judges follow juries' sentencing recommendations, we decline to revisit Helsley. Our recent decision in Pittman v. State, 885 N.E.2d 1246 (Ind. 2008), also addresses this issue.

18