**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MARK A. BATES**
Office of the Lake County Public Defender
Appellate Division
Crown Point, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JUSTIN F. ROEBEL**
Deputy Attorney General
Indianapolis, Indiana



FILED
Oct 02 2012, 9:27 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DOUGLAS THOMPSON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A03-1201-CR-5 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Clarence D. Murray, Judge
Cause No. 45G02-1004-MR-7

**October 2, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Douglas Thompson ("Thompson") appeals his conviction of and sentence for murder, a felony, contending that the trial court erred by admitting his recorded statement to police officers and evidence seized pursuant to a search warrant, and that his sentence is inappropriate in light of the nature of the offense and character of the offender.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to the verdict and relevant to this appeal reveal that on the evening of April 9, 2010, Beverly Thompson ("Beverly") was found dead in a pool of blood in her home at 632 Hillside Street in Dyer, Indiana, by her daughter, Cheryl Majchrowicz ("Cheryl"). Beverly's son-in-law, Mark Majchrowicz ("Mark"), attempted resuscitation, but noted that her body felt lukewarm or cold. It was later determined that her death was caused by multiple blunt force traumas to her head, likely inflicted by use of a hammer or something similar. The traumas to her head resulted in extensive skull fracturing, extensive lacerations, and multiple hemorrhages in her brain. A coroner determined that the extensive bleeding indicated that Beverly did not die immediately, but survived and bled for a period of time after the wounds were inflicted.

Officers who responded to the scene observed that the house appeared as if it had been staged to look like a burglary had occurred. Most of the house was organized with only a few items of jewelry missing. Some drawers were open, but in a stair-stepped manner with many of the contents undisturbed. Items of observable value were left untouched, including rings, watches, necklaces, televisions, and computers. A purse and a bank bag containing

2

$1,100 in cash were left in plain sight. Two officers testified that the door to the garage, the apparent point of entry, was damaged in a way suggesting the damage occurred while the door was already open.

The investigation began with an interview of Beverly's family members. Beverly's daughter told the officer that Beverly had worked at her beauty shop until approximately 3:30 p.m. and then drove home, calling Cheryl and Cheryl's sister, Amy Bensema ("Amy"), while driving. Officers also spoke with Thompson, who had been married to Beverly for forty-one years. On the first occasion, Thompson was interviewed at St. Margaret Mercy Healthcare Hospital, where he was being treated for anxiety. Thompson told the officers that he had only stopped by his residence that afternoon to retrieve some boxes, and did not mention seeing his wife. He stated that he was accompanied by his employee, Reginald Coleman ("Coleman"). When the officers told Thompson that Beverly had been killed, he insisted that she had died of a heart attack.

The officers interviewed Coleman that same evening. Coleman told them that he and Thompson had been working together at Thompson's liquor store and left work together in Thompson's truck at approximately 2:45 p.m. The two went to Thompson's house where Coleman waited in the garage while Thompson spent approximately twenty to twenty-five minutes in the house. Coleman stated that he did not know the reason why they were stopping at the house, but had been told that they would not be doing any work there. The two had brought boxes from the store to give to Thompson's daughter, Cheryl, for her to use while moving. When Thompson returned to the truck, he was carrying a black garbage bag,

3

which he tossed in the back of his truck. Thompson told Coleman that Beverly would be arriving soon and went back into the house.

Beverly arrived and parked her car in the garage. Thompson met Beverly and they went into the house together. When Thompson returned approximately thirty minutes later, Coleman noticed that Thompson was wheezing as if he had done some heavy lifting or moving. Thompson put another black garbage bag in the bed of the truck, and the two left Thompson's house. Police officers later confirmed Coleman's timeline with a neighbor's surveillance video.

Coleman and Thompson went to Cheryl's house for about forty-five minutes before Thompson left to take Coleman to his apartment. The apartment was half of a duplex owned by Thompson, which Coleman shared with Thompson's sister. Thompson, Cheryl, Amy, and Thompson's sons-in-law had decided to go to a restaurant for dinner. Thompson and Cheryl placed calls to Beverly to no avail. Cheryl and Mark drove to her parents' house because they were going to give Thompson a ride to the restaurant. They discovered Beverly's body at that time, and Thompson arrived shortly thereafter. Officers arrived almost immediately in response to the 911 call, and it was then that Thompson inquired if Beverly had suffered a heart attack. Thompson began to hyperventilate and was later taken to the hospital.

On the afternoon of April 10, 2010, officers brought Thompson to the police station for a second statement. Thompson was met by attorney Joseph Bombagetti ("Bombagetti"), who happened to be a family member. Bombagetti told the officers at the outset, "Before this gets going, I don't do criminal law for a living, so I am kinda trying to understand why

4

we need a recorded statement." *Ex*. 112 at 15:35:00-07. One of the officers told Bombagetti that they were making it a practice to record all statements, and noted that it would be a requirement as of January 1, 2011. Bombagetti replied that they would be willing to cooperate if the officers insisted on recording Thompson's statement, but that he wanted to have Thompson speak with an attorney who practiced criminal law and reschedule the statement for later in the week.

One of the officers told the two that they wanted an "open discussion" about the recording issue and told Thompson that everyone involved in the investigation would want the matter to be resolved quickly. Bombagetti agreed that it was important to act swiftly and asked the officers what topics they wanted to clarify in the second statement. The officers told the two that they wanted to revisit Thompson's timeline. Bombagetti told the officers that Thompson had already provided that information, and that if they were going to ask the same questions, only recording them this time, he was going to have to request that they reschedule the meeting. The officers explained that they were not trying to ask the same questions, but were trying to go over the timeline after Thompson had a chance to calm down and understand what had occurred. Immediately following that explanation, Thompson began to repeat his account of what had occurred without making further requests that his statement not be recorded or asking that the meeting be rescheduled.

During the interview, Thompson told the officers that he was only home long enough to urinate before Beverly arrived and that he left only a few minutes later. While Thompson was in the interview room, the officers examined Thompson's cell phone, which showed that

5

Beverly had called Thompson's cell phone at 3:22 p.m. Thompson, however, denied that the phone call occurred. Thompson further denied Coleman's claim that Thompson picked up a garbage bag at the house. Thompson said, "there was no fucking garbage bag in the back of my truck." *Ex*. 112 at 17:14:20-24. The recorded statement also included two segments where Thompson was alone speaking with Bombagetti.

After the interview, Thompson went to his daughter Amy's house. When he returned there he told Beverly's brother, Robert Tortolano, Sr. ("Tortolano"), that Coleman had "changed the fucking story." *Tr*. at 238. Amy, and her husband, Scott Bensema ("Scott"), heard Thompson say that Coleman was "changing his story." *Id*. at 119, 164. Thompson explained that he and Coleman were "at the house for five minutes," and Coleman claimed they were there for "an hour and a half." *Id*. at 239. Thompson also claimed that Coleman "don't know the difference between a bag and a box." *Id*.

After obtaining the statements from Coleman and Thompson, officers obtained a search warrant for Coleman's apartment and "all buildings, barns, garages, sheds, or other structures located upon such real estate." *Search Ex*. 1 at 1. Officer Dan Foley ("Officer Foley") stated in his supporting affidavit that Beverly had been found dead in a pool of blood at her residence, that there was evidence the garage entrance door had been damaged, and the back sliding door was open. *Id*. at 3-4. He also stated that a glove was on the ground in front of the sliding glass door. *Id*. Officer Foley further stated that both Thompson and Coleman admitted to being present at the residence a few hours before the body was discovered, their

accounts differed. Those discrepancies were highlighted in the affidavit, which also included the fact that Thompson was the owner of the duplex where Coleman lived.

During the course of the search, officers recovered a black garbage bag of clothing in the carport, which was inside a paper lawn refuse bag along with lawn debris. The clothing included a pair of pants, a shirt, and socks. Testing showed the clothing was spattered with Beverly's blood and also contained Thompson's DNA in the collar of the shirt and the waistband of the pants. While there, the officers saw a pickup truck, which was registered to Thompson's business, in the carport. An air conditioning unit was in the bed of the truck. From that unit, the officers were able to recover a department store bag with jewelry inside, including a bag labeled "Beverly" in which a bracelet owned by Beverly was contained.

Coleman and Thompson were arrested for Beverly's murder that same night. Thompson unsuccessfully moved to suppress the recorded statement to police and the evidence obtained from the search of Coleman's apartment. At Thompson's trial, Coleman testified against Thompson under an agreement that his testimony would not be used against him in his pending murder prosecution except for impeachment purposes. At the conclusion of the jury trial, Thompson was found guilty as charged. The trial court sentenced Thompson to a term of sixty-five years executed. Thompson now appeals.

## DISCUSSION AND DECISION

Thompson challenges the admission of his recorded statement to law enforcement officers and of the evidence seized during the search of Coleman's apartment pursuant to the search warrant. Although framed as error predicated upon the denial of his motion to

7

suppress, the issue on direct appeal after a completed trial is more appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial. *Danner v. State*, 931 N.E.2d 421, 426 (Ind. Ct. App. 2010).

The standard used to review rulings "on the admissibility of evidence is effectively the same whether the challenge is made by a pre-trial motion to suppress or by a trial objection." *Burkes v. State*, 842 N.E.2d 426, 429 (Ind. Ct. App. 2006). Questions regarding the admission of evidence are resolved within the sound discretion of the trial court, and we review the court's decision only for an abuse of discretion. *State v. Seabrooks*, 803 N.E.2d 1190, 1193 (Ind. Ct. App. 2004). A trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id*. Additionally, errors in admitting evidence are to be disregarded as harmless error unless they affect the substantial rights of the party. Ind. Trial Rule 61; *Turben v. State*, 726 N.E.2d 1245, 1247 (Ind. 2000). Upon review, we will only consider the evidence in favor of the trial court's ruling and unrefuted evidence in a defendant's favor. *Sallee v. State*, 777 N.E.2d 1204, 1210 (Ind. Ct. App. 2002). We will not reverse the trial court's decision if the decision is sustainable on any ground. *Crawford v. State*, 770 N.E.2d 775, 780 (Ind. 2002).

Thompson contends that the trial court erred by allowing the admission of his recorded statement to law enforcement officers. He argues that the recording of his statement violated his attorney-client privilege. During the trial, however, the State only asked that the jury view the portions of the statement where the officers were questioning

8

Thompson.  Thompson, by counsel, insisted that the entire recorded statement be played to the jury and waived the privilege for that purpose.  Consequently, any error in admitting the entire recorded statement was invited error, which is not reversible error.  *See Booher v. State*, 773 N.E.2d 814, 822 (Ind. 2002).

Moreover, Thompson's right to counsel was not violated.  The Sixth Amendment to the United States Constitution "guarantees all criminal defendants the right 'to have the assistance of counsel for his defense.'" *Bassett v. State*, 895 N.E.2d 1201, 1205 (Ind. 2008) (quoting U.S. Const. amend. VI).  "Similarly, article I, section 13, of the Indiana Constitution provides that in 'all criminal prosecutions, the accused shall have the right . . . to be heard by himself and counsel.'" *Id*. at 1206 (quoting Ind. Const. art. I, § 13(a)).  The right includes "[f]ree two-way communication between [the] client and [his] attorney." *Id*. (quoting *United States v. Levy*, 577 F.2d 200, 209 (3d Cir. 1978)).

"The federal right to counsel as protected by the Sixth Amendment, so as to ensure a fair trial after charges are filed, *cf. United States v. Gouveia*, 467 U.S. 180, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984), is not implicated [where the defendant has] not been charged or arraigned at the time of the alleged constitutional deprivation." *Ajabu v. State*, 693 N.E.2d 921, 927 (Ind. 1998).  At the time the recorded statement was made, charges had not yet been filed against Thompson.  Here, unlike the situation presented in *Ingram v. State*, 760 N.E.2d 615 (Ind. Ct. App. 2001), a case relied upon by Thompson, the State has not conceded applicability.

9

Additionally, the record reveals that Thompson waived the privilege by continuing to talk with Bombagetti in a room Thompson knew was capable of audio and video recording. In *Whitehead v. State*, 500 N.E.2d 149, 154 (Ind. 1986), our Supreme Court re-emphasized that the well-settled nature of the proposition that the attorney-client privilege is not absolute for all purposes, belongs to the client, and may be waived by the client. Here, Thompson entered the room, looked into the camera, and observed that "there's cameras all over this place" and also noted speakers. *Ex.* 112 at 15:05:00-11. Bombagetti specifically asked to reschedule the meeting with the officers because he knew the officers were recording the statements made in the room, in addition to the fact that he did not practice criminal law. Thompson continued to speak nonetheless.

Thompson has failed to establish that he was prejudiced by the recording of his conversations with Bombagetti. An examination of whether the recording of conversations between a defendant and his attorney has resulted in prejudice and its effect on the defendant's conviction is a relevant inquiry. *Weatherford v. Bursey*, 429 U.S. 545, 552 (1977). Officer Foley testified that he did not know the contents of the interview and was not aware whether officers watched Thompson's conversation with Bombagetti. Detective Dennis Eaton, an officer who interviewed Thompson at the police station, testified that he had never watched the portions of the recorded statement, where Thompson is speaking only with Bombagetti, and he was not aware that any other officer had watched those portions.

Bombagetti's statement to the effect that failing to cooperate in the investigation would only make things worse, is not inculpatory, but sound advice. The statement does not

10

suggest that Bombagetti knew Thompson was guilty. Thompson told counsel that he was never in the house and had never changed his clothing. In addition, in response to Bombagetti's observation that Thompson had scars on his arms, Thompson explained that they were the remnants of blood blisters that were healing. Therefore, even had the officers watched those portions of the recorded statement, it is not clear how that would have resulted in prejudice to Thompson. Thompson has failed to show that anyone watched those portions of the statement prior to trial or that any probative evidence resulted from information given during the conversations.

To the extent that Thompson claims that his recorded statement was tantamount to an involuntary confession, we disagree. "When a defendant challenges the admissibility of his confession the State must prove beyond a reasonable doubt that the confession was given voluntarily." *Jackson v. State*, 735 N.E.2d 1146, 1153 (Ind. 2000) (quoting *Carter v. State*, 730 N.E.2d 155, 157 (Ind. 2000); *Schmitt v. State*, 730 N.E.2d 147, 148 (Ind. 2000)). In *Jackson*, our Supreme Court made the following observation:

> We note that the federal constitution requires the State to prove only by a preponderance of the evidence that a defendant's confession was voluntarily given. However, in Indiana we require the State to prove the voluntariness of a confession beyond a reasonable doubt, and trial courts are bound to apply this standard when evaluating such claims.

735 N.E.2d at 1153 n.4 (internal citations omitted).

"In evaluating a claim that a statement was not given voluntarily, the trial court is to consider the totality of the circumstances, including: 'the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education,

11

physical condition, and mental health.'" *Pruitt v. State*, 834 N.E.2d 90, 115 (Ind. 2005) (quoting *Miller v. State*, 770 N.E.2d 763, 767 (Ind. 2002)).

We agree with the State that these due process concerns are not applicable because Thompson's recorded statement was not a confession or a custodial statement. "The foundational requirements for admission of a tape recording made in a non-custodial setting are: 1) that the recording is authentic and correct, 2) that it does not contain evidence otherwise inadmissible, and 3) that it be of such clarity as to be intelligible and enlightening to the jury." *McCollum v. State*, 582 N.E.2d 804, 811-12 (Ind. 1991). Thompson does not challenge any of these elements.

Thompson acquiesced to making the recorded statement by continuing to answer questions after the officers explained why recording was necessary. Bombagetti twice asked if the interview could be rescheduled if it was going to be recorded. Both times the officers provided reasons why the interview should go ahead. The officers maintained their position that the interview should be recorded. Thompson began reciting his account of what had occurred without requesting that the interview be rescheduled or not recorded. He could have refused to answer the questions, his attorney could have instructed him not to answer, and Thompson was free to leave at any time. The trial court did not abuse its discretion by finding that Thompson acquiesced to the recording of his statement.

Moreover, assuming for the sake of argument that the admission of the statements was improper, the error, if any, was harmless. "Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted

12

evidence was cumulative of other evidence appropriately admitted. *Payne v. State*, 854 N.E.2d 7, 17 (Ind. Ct. App. 2006).

In particular, Thompson claims that three items taken from the interview were used by the State to prove his guilt: 1) the phone call to Thompson's cell phone from Beverly at 3:22 p.m. the day she was murdered; 2) Thompson's gambling problem; and 3) a phone call Thompson received during the course of the interview. Regarding the call from Beverly, the officers had other evidence of that call because they had possession of the records from Beverly's phone. Regarding Thompson's gambling problem, Officer Foley had secured records from the Majestic Casino which indicated that Thompson had lost $62,000 since 1996 there. The State used the evidence that Thompson answered a cell phone call during the interview to illustrate how inappropriate the conduct seemed in light of the fact that the officers were investigating the death of Thompson's wife. Evidence that Thompson called an insurance agent was separate and that call occurred the prior night.

Admission of that evidence, if error, was harmless considering the strong DNA evidence linking Thompson to the killing and the recovery of the missing jewelry from the air-conditioning unit in his truck. Video surveillance evidence established that Thompson lied when he claimed that he was not at home. Thus, while not concluding that the trial court erred in admitting the evidence, even if erroneous, it would be harmless error.

Thompson also challenges the admission of the evidence seized pursuant to a search warrant for the apartment Coleman rented from Thompson. "In determining whether to issue a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common

sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Newby v. State*, 701 N.E.2d 593, 597-98 (Ind. Ct. App. 1998) (quoting *Jaggers v. State*, 687 N.E.2d 180, 181 (Ind. 1997) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983))). Upon review of a magistrate's decision to issue a warrant, we apply a deferential standard. *Lloyd .v State*, 677 N.E.2d 71, 73 (Ind. Ct. App. 1997). The magistrate's decision to issue the warrant will be affirmed if he had a "substantial basis" for concluding that probable cause to search existed. *Id*. A "substantial basis" analysis requires the reviewing court to examine whether the reasonable inferences drawn from the totality of the evidence support the probable cause determination. *Jaggers*, 687 N.E.2d at 181-82.

The probable cause affidavit supporting the search warrant application included the following pertinent information on four main topics: 1) Beverly had been found dead in her home in a pool of blood, there was evidence of damage to the garage entrance door, and a glove was found on the ground in front of the sliding glass door; 2) Thompson and Coleman had each been interviewed and admitted to being at the residence a few hours prior to the discovery of Beverly's body, but their accounts differed in terms of the length of time they were there and the purpose for the stop; 3) Thompson denied receiving a telephone call from Beverly around that time, despite his cell phone showing that he had received a fifty-four second call from Beverly at 3:22 p.m.; and 4) Coleman lived in the upper apartment of 1945 Hart Street, and Thompson owned that duplex. *Search Ex.* 1.

We conclude that these facts established probable cause sufficient to justify the issuance of the search warrant for Coleman's apartment. Beverly was found dead at her residence and the circumstances suggested criminal activity at the house. Coleman and Thompson were the last known people at the residence. Thompson claimed that he and Coleman were at the residence only briefly, while Coleman stated that they had seen Beverly and were there for a significant amount of time. Thompson claimed they were there to retrieve some boxes and just long enough for him to urinate. Coleman, on the other hand, stated that they had brought boxes with them from the liquor store, and he did not know why they were stopping at the house. Coleman was one of the last people at the residence where Beverly died and gave a conflicting account of his whereabouts. Probable cause existed to search his apartment for evidence of the crime because of the nexus between the crime and the apartment.

Assuming *arguendo* that there was insufficient probable cause to support the issuance of the search warrant, the trial court did not abuse its discretion by admitting the evidence. "The Supreme Court of the United States held in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), that the exclusionary rule does not require the suppression of evidence obtained in reliance on a defective search warrant if the police relied on the warrant in objective good faith." *State v. Spillers*, 847 N.E.2d 949, 957 (Ind. 2006). Indiana Code section 35-37-4-5 codifies the good faith exception to the warrant requirement.

Here, there was no evidence to show that law enforcement officers misled the court or provided false information in support of the search warrant application. Officer Foley was

also aware that Coleman and Thompson went to Coleman's apartment at 1945 Hart Street shortly before Beverly's body was discovered. We conclude that the officers' belief in the validity of the search warrant was reasonable and supports the conclusion that they relied upon it in good faith. The trial court did not abuse its discretion in admitting the evidence seized pursuant to the search warrant.

Thompson also challenges the officers' search of the carport at the 1945 Hart Street location. Our Supreme Court has held that a validly issued warrant for the search of a residence also authorizes a search of the surrounding curtilage. *Sowers v. State*, 724 N.E.2d 588, 590-91 (Ind. 2000). In *Sowers*, the search of the curtilage was not requested in the affidavit supporting the search warrant application. 724 N.E.2d at 589. The search of the carport in the present case was authorized.[1] Unlike the situation in *Figert v. State*, 686 N.E.2d 827 (Ind. 1997), where the search of multiple units, *i.e.*, mobile homes, at a single address by way of a single search warrant was met with disfavor, the officers here, were specifically authorized to search the curtilage. Thompson, who along with Coleman was a suspect in Beverly's murder, owned the property and had access to the outbuildings.

We also disagree with Thompson's contention that the evidence found during the search should not have been admitted because the supporting probable cause affidavit was tainted by virtue of Thompson's statement being recorded. As previously discussed, we concluded that Thompson acquiesced to the recording of his non-custodial statement.

---

[1] The search warrant specifically authorized the officers to search the upper apartment of 1945 Hart Street, including any and all buildings, barns, garages, sheds, or other structures located on the real estate. *Search Warrant Ex.* 1 (filed Apr. 26, 2010).

Thompson consistently maintained that he wished to speak with the officers, he merely challenged the necessity of recording the statement, a challenge he abandoned when he voluntarily gave his version of the events. Thus, the recorded nature of the statement did not taint the probable case affidavit as Thompson expressed his willingness to provide the information. We find no error in the trial court's decision to admit the challenged evidence.

Thompson next claims that his sixty-five-year sentence is inappropriate in light of the nature of the circumstances and the character of the offender. Appellate courts may revise a sentence after careful review of the trial court's decision if they conclude that the sentence is inappropriate based on the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). Even if the trial court followed the appropriate procedure in arriving at its sentence, the appellate court still maintains a constitutional power to revise a sentence it finds inappropriate. *Hope v. State*, 834 N.E.2d 713, 718 (Ind. Ct. App. 2005). The defendant has the burden of persuading the appellate court that his sentence is inappropriate. *King v. State*, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008).

We agree with the trial court that the nature of the crime was a significant aggravating factor. Beverly received multiple blows with an instrument such as a hammer, and bled to death after the attack concluded. The nature of the offense does not warrant a revision of Thompson's sentence.

Although Thompson has a total lack of criminal history to which the trial court assigned no mitigating weight, we find no error in the trial court's decision. "[Particular circumstances of a criminal act may constitute separate aggravating circumstances." *Vasquez*

*v. State*, 762 N.E.2d 92, 93 (Ind. 2001). If a circumstance of the criminal act is considered as an aggravating factor, it is generally "thought to be associated with particularly heinous facts or situations." *Smith v. State*, 675 N.E.2d 693, 698 (Ind. 1996). Such was the case here.

The trial court noted the significant difference between Thompson's and Beverly's size and weight. Further, Thompson, a person Beverly should have trusted the most, murdered her, his wife of forty-one years, in the home they shared, which was a place where she should have felt safe. The trial court also noted that Thompson attempted to stage the scene to appear like a botched burglary attempt and allowed his daughter and son-in-law to discover Beverly's body. Beverly did not immediately die from the numerous wounds to her head, which were inflicted by a blunt object that caused massive blood loss indicative that she suffered before dying. Thompson's sentence is not inappropriate in light of the nature of the offense and the character of the offender.

To the extent that Thompson appears to argue that the trial court assigned an inappropriate weight to his lack of remorse, our standard of review on appeal prevents us from considering that argument. *See Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g* 875 N.E.2d 281 (2007).

Affirmed.

NAJAM, J., and MAY, J., concur.