Elizabeth MAYBERRY, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 32S00–9411–CR–1076.

Supreme Court of Indiana.

July 19, 1996.

Rehearing Denied Dec. 23, 1996.

Susan K. Carpenter, Public Defender of Indiana, David P. Freund, Deputy Public Defender, Indianapolis, for Appellant.

Pamela Carter, Attorney General of Indiana, Lisa M. Paunicka, Deputy Attorney General, Indianapolis, for Appellee.

SULLIVAN, Justice.

We affirm defendant Elizabeth Mayberry's conviction for the murder of minister Roland Phillips, committed as he concluded his Sunday sermon at the North Salem United Methodist Church.

*Background*

In May, 1992, defendant met Phillips, a student pastor at the North Salem United Methodist Church, at a singles retreat sponsored by the United Methodist Church. Defendant and Phillips dated for several months after the retreat. During the course of their relationship, defendant, then 35 years old, claims that Phillips encouraged her to allow him to kiss her using his tongue, engage in consensual, mutual, oral sex with him, fondle and kiss her breasts, and digitally penetrate her vagina. Defendant had never before had intimate physical contact with a man. Phillips would later deny to church officials that he had ever engaged in oral sex with defendant. Defendant's relationship with Phillips took a turn for the worse in August of 1992. In an attempt to salvage the relationship, defendant wrote Phillips letters inquiring into the status of their relationship. In one of these letters, she asked Phillips to attend counseling with her. In November, 1992, defendant received a letter from Phillips in which he stated that their relationship was over. This letter deeply hurt defendant and made her angry.

In December, 1992, defendant filed a complaint with the United Methodist Church (UMC) in which she alleged that Phillips had engaged in sexual misconduct. When speaking about her relationship with Phillips to Reverend Harry Coleman, defendant stated: "My concern is for the next woman with whom he chooses to have a relationship. What kind of damage will he do to her life? He says his behavior is a pattern. I believe it is one which must be broken." After several hearings on defendant's complaint, the UMC Committee on Ordained Ministry determined, in May, 1993, that Phillips was to retain his position as a student pastor. Upon learning the result of her complaint, the defendant became extremely distraught.

Although defendant continued to work, she became withdrawn and cut everyone off. Defendant no longer believed in God and felt like the church had treated her terribly. Despite the fact that defendant sought counseling, in June, 1993, she started having thoughts about killing herself. She also began writing a book on her personal computer.

She thought if she wrote down what had happened to her, she might be able to make some sense of it. On August 2, 1993, defendant purchased a handgun and box of ammunition in Bloomington. On August 19, 1993, a firearms expert and trainer spent two hours with defendant at her house showing her how to use and care for the gun.

On September 18, 1993, defendant loaded the gun with five cartridges. On Sunday morning September 19, defendant, with the gun concealed in her purse, drove to North Salem United Methodist Church. Defendant arrived in front of the church at about 11:00 a.m. and parked her car across the street. Upon entering the sanctuary, defendant never took her eyes off of Phillips, who was delivering a sermon from the pulpit. Defendant walked down the center aisle toward the pulpit. As she approached the pulpit, Phillips turned and looked at her and told her that he would speak with her after the service concluded. Defendant stood silently at the left side of the pulpit and watched Phillips finish his sermon. Phillips finished his sermon, asked the congregation to stand, and announced the last hymn. Defendant pulled the gun out of her purse, aimed it directly at Phillips and fired twice. Phillips's knee's buckled and he fell to the floor. Defendant exclaimed: "You raped me! You raped me!" Phillips responded: "No I didn't. No I didn't." Defendant walked closer to Phillips and fired the gun two more times. Two members of the congregation ran to the altar, pushed defendant down, and pried the gun from her hand. Another member of the congregation sat on defendant until the police came. Phillips's daughter, who was in the congregation, walked up to the altar, leaned over and kissed her father, and told him that she loved him. Phillips told his daughter that he loved her. The paramedics arrived shortly thereafter and took Phillips to the hospital where he died due to loss of blood from gunshot wounds to the neck, chest, wrist, and leg.

Officer John Hancock arrived at the church and confiscated defendant's gun. Inside defendant's purse, the officer found a box of bullets as well as a note that stated: "He is not worth dying for, but the innocent woman he killed is." Approximately two hours after the killing, defendant gave a statement to Officer Susan Austin in which she described in detail her relationship with Phillips, her devastation when the relationship ended, and her plan to kill Phillips. Defendant also told Austin that she had saved the fifth bullet in the gun to kill herself, but she was subdued before she could shoot herself.

On September 20, 1993, the State filed an information charging defendant with Murder.[1] On October 11, 1993, defendant filed a notice of insanity pursuant to Indiana Code § 35–36–2–1 (1993). Defendant's jury trial commenced on June 13, 1994. The jury found defendant guilty but mentally ill[2] of Murder on June 22, 1994. The trial court sentenced defendant to a term of sixty years on July 20, 1994.

*Discussion*

I

A

■ In a hearing outside the presence of the jury, defense witness Jennie Maretto, a friend of Phillips and a paralegal for a law firm in Fishers, Indiana, testified that Phillips contacted her at work to obtain legal advice regarding a letter he wrote to the UMC in response to the complaint that defendant had filed. Maretto testified that she felt that she was not legally able to give Phillips legal advice but would have to consult with an attorney. Maretto stated that Phillips asked her to consult an attorney. Maretto also testified that she gave a statement regarding her conversations with Phillips to Officer Danny Williams. When defense counsel inquired about the letter Phillips asked Maretto to look over, the State asserted the attorney-client privilege on Maretto's behalf as to any communication between Maretto and the victim. The trial court sustained the State's objection to the admission of Maretto's testimony.

---

1. Ind.Code § 35–42–1–1 (1993).

2. Ind.Code § 35–36–2–3 (1993).

In an offer to prove, the defense introduced into evidence a police report prepared by Officer Williams. In the report, Officer Williams states that when he spoke with Maretto she informed him that Phillips had contacted her to obtain legal advice. The report also states that Maretto advised the officer that Phillips stated that Phillips and defendant had engaged in consensual, mutual oral sex.

■ Defendant contends that the trial court erroneously determined that the attorney-client privilege attached to comments Phillips made to Maretto because Maretto did not adequately establish that Phillips contacted her in an effort to employ an attorney for professional advice or aid. In *Colman v. Heidenreich*, 269 Ind. 419, 381 N.E.2d 866 (1978), this court made the following observations:

> The attorney-client privilege is a very important provision in our law for the protection of persons in need of professional legal help. It makes provision for a person to give complete and confidential information to an attorney, so that the attorney may be fully advised in his services to the client. At the same time, it assures the client that these confidences will not be violated.

*Colman*, 269 Ind. at 421, 381 N.E.2d at 868. Indiana Code § 34–1–14–5 (1993) provides that attorneys shall not be competent witnesses "as to confidential communications made to them in the course of their professional business, and as to advice given in such cases." This "attorney-client privilege not only plays a role in our law of evidence but is also fundamental to our rules of professional conduct which forbid attorneys from revealing 'information relating to representation of a client unless the client consents after consultation.' *See* Ind.Professional Conduct Rule 1.6." *Corll v. Edward D. Jones & Co.*, 646 N.E.2d 721, 724 ( Ind.Ct.App.1995). As long as an attorney is consulted on business within the scope of the attorney's profession, "it is of no moment to the privilege's application that there is no pendency or expectation of litigation. Nei-

ther is it of any moment that no fee has been paid." *Colman*, 269 Ind. at 423, 381 N.E.2d at 869 (citations omitted). Rather, the essential prerequisites to invocation of the privilege are to establish by a preponderance of the evidence (i) the existence of an attorney-client relationship and (ii) that a confidential communication was involved. *See Colman*, 269 Ind. at 423, 381 N.E.2d at 869. To meet the burden of showing that an attorney client relationship existed, the State had to, at the very least, establish that the communication at issue occurred in the course of an effort to obtain legal advice or aid, on the subject of the client's rights or liabilities, from a professional legal advisor acting in his or her capacity as such. *Id.*; *United States v. Demauro*, 581 F.2d 50, 55 (2nd Cir.1978).

Defendant suggests that Phillips's communications with his friend Maretto are privileged "only if his asking her to have an attorney look over his papers can be construed to be an attempt by Phillips to employ legal counsel." Defendant also states that the State failed to meet its burden of establishing that Maretto's communications with Phillips were privileged because she did not testify that Phillips intended to or sought to employ her firm to represent him concerning his difficulties with the complaint defendant filed with the church. Defendant misstates the State's burden. Although Maretto and Phillips were social friends, the record reveals that Phillips approached Maretto at the law firm where she worked as a paralegal/office manager and asked her to consult an attorney regarding his legal concerns. We believe these facts can be read to establish that the communications at issue occurred in the course of an effort to obtain legal advice or aid from a professional legal advisor in his capacity as such. *Colman*, 269 Ind. at 423, 381 N.E.2d at 869; *Demauro*, 581 F.2d at 55. Therefore, we cannot say that the trial court erred in determining that the State met its burden of showing the existence of an attorney-client relationship. And if the communications at issue occurred during an attempt to procure professional legal aid, confidential communications were involved here.[3] *See Colman*, 269 Ind. at 423,

---

3. [N]ot every communication between an attorney and a client is a "confidential communica-

tion" and entitled to a reasonable expectation of confidentiality. For example, as a general

381 N.E.2d at 869. Therefore, the trial court did not abuse its discretion in determining that the communications between Maretto and Phillips were subject to the attorney-client privilege.

## B

■ While Maretto was on the witness stand, the defense also inquired as to what she had told Officer Williams about her communications with Phillips. The State objected asserting that the attorney-client privilege applied to Maretto's communications to Phillips. The trial court sustained the State's objection. The State then informed the court that it understood that defendant intended to call Officer Williams to testify concerning what Maretto told him about Phillips. The State objected to any testimony from Officer Williams on the basis that it would constitute hearsay. The trial court allowed the parties an opportunity to research and brief the issue and subsequently sustained the State's objection. Defendant contends that the trial court erred in refusing to allow Officer Williams to testify because there were valid exceptions to the rule against hearsay evidence for all hearsay at issue here.

Williams's testimony that Maretto told him certain statements that Phillips told her would have been hearsay within hearsay. *Davis v. State*, 635 N.E.2d 1117, 1122 (Ind. Ct.App.1994). As such, each level of hearsay must qualify under an exception to the hearsay rule. Ind.Evidence Rule 805. Defendant argues that Phillips's statements to

Maretto were statements against Phillips's pecuniary and proprietary interest [4] because his alleged admission of engaging in oral sex with Mayberry may have subjected him to dismissal from his position as a student pastor. Additionally, argues defendant, Maretto's statements to Williams regarding what Phillips told her were against Maretto's pecuniary and proprietary interest because Maretto could have been fired for breaching the attorney-client privilege. It follows, argues defendant, that there is a valid exception to the rule against hearsay for each level of hearsay involved here, and the trial court, therefore, erroneously excluded Williams's testimony.

■ Even if we assume, *arguendo*, that Maretto's statement to Williams was a statement against Maretto's interest and that Phillips's statement to Maretto was a statement against Phillips's interest so that there was a hearsay exception for all hearsay at issue, we think Williams's testimony was properly excluded because Phillips's statement to Maretto was subject to the attorney-client privilege. Information subject to the attorney-client privilege retains its privileged character until the client has consented to its disclosure.[5] *Key v. State*, 235 Ind. 172, 175, 132 N.E.2d 143, 145 (1956). Phillips did not consent to Maretto's disclosures to Williams. Therefore, the information possessed by Williams was privileged. In short, privileged information does not cease to be privileged merely because it is subject to the statement against interest hearsay exception.[6] We con-

rule information regarding a client's attorney's fees is not protected by the attorney-client privilege because the payment of fees is not considered a confidential communication between attorney and client. A client's identity is not usually considered privileged information. [B]ut see *Colman*, 269 Ind. at 427, 381 N.E.2d at 871 (identity of client privileged under circumstances where to reveal the client's name would disclose confidential communications). Similarly, communications which are intended to be made public are not privileged, as there is clearly no expectation of confidentiality. *Corll*, 646 N.E.2d at 725 (some citations omitted).

4. *See* Ind.Evidence Rule 804(b)(3).

5. *Although defendant does not raise the argument, we also note that Maretto's disclosures to*

Williams did not serve to waive the privilege because the privilege belongs to the client and can only be waived by conduct attributable to the client. *Key*, 235 Ind. at 175, 132 N.E.2d at 145. Further, the attorney-client privilege survives the client's death and accrues to his or her representative. *Buuck v. Kruckeberg*, 121 Ind.App. 262, 271, 95 N.E.2d 304, 308 (1950).

6. Were it otherwise, the attorney-client privilege could be circumvented whenever privileged information has been disclosed to a third party without the client's consent. The third party's testimony would be admissible in court under the statement against interest hearsay exception because the attorney who made the confidential disclosure would be subject to professional discipline for so doing. *See* Ind.Professional Conduct Rule 1.6.

clude that the trial court properly excluded Williams's testimony.

## II

■ During the presentation of her defense, the defendant sought to admit a copy of a manuscript she wrote that chronicled her relationship with Phillips from the day they met until the week before she killed him. In a hearing outside the presence of the jury, the State objected to the admission of the manuscript on grounds that it was self-serving hearsay and contained hearsay within hearsay. Defendant responded by stating that the manuscript was relevant to show her state of mind right before the murder and that it was not being offered for the truth of the matters contained therein. The court stated that the manuscript probably qualified as an exception to the rule against the admission of hearsay evidence under Indiana Evidence Rule 803(3) as a statement of defendant's then existing state of mind. However, the trial court excluded the manuscript under Indiana Evidence Rule 403 finding that it would be cumulative of defendant's testimony and that the prejudice of admitting the hearsay contained in the manuscript outweighed its relevancy. Defendant contends that the trial court erroneously excluded the manuscript because it provided a unique view of defendant's mental processes prior to the shooting, and defendant's state of mind and alleged insanity at the time of the shooting were the only contested issues in the case. Thus, defendant argues that the manuscript had great relevance that was not outweighed by any prejudice resulting from the hearsay statements contained therein.

Indiana Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Thus, a trial court has broad discretion to determine the probative value of relevant evidence in contrast to its potential prejudicial impact. *See Wallace v. State,* 486 N.E.2d 445, 460 (Ind.1985), *cert. denied* 478

U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 723 (1986). If this manuscript in fact provided some perspective or insight as to the defendant's state of mind distinct from her testimony, we fail to see how it would be cumulative of other evidence presented. However, we have carefully reviewed both the manuscript and defendant's testimony and conclude that the manuscript provided no insights as to defendant's state of mind just prior to the murder that were not revealed during her testimony. Moreover, the manuscript is replete with hearsay statements attributable to the victim, UMC church officials, and others. Because the manuscript was in fact cumulative of other evidence presented, namely the defendant's testimony, and rife with hearsay, we cannot say that the trial court abused its discretion by determining that the manuscript's probative value was substantially outweighed by danger of unfair prejudice.

## III

■ Defendant was taken to the Hendricks County Jail where, about two hours after the shooting, she was placed in an interview room that was equipped with a stationary video camera in the ceiling. While in the interview room defendant made a confession to Detective Sergeant Susan Austin. The entire conversation between defendant and Sgt. Austin was video taped. There is not an official, complete, verbatim transcript of the conversation between defendant and Sgt. Austin. Prior to trial, defendant filed a motion to suppress her confession on grounds that it was given without the assistance of counsel after she had requested a lawyer. Following a hearing and after the trial court had viewed the entire video tape, the trial court denied defendant's motion to suppress. The trial court stated:

[O]n the issue of voluntariness, the court finds after reviewing the video tape ... that the defendant did knowingly and voluntarily waive her Miranda Rights. The questioning that continued after she first [sic] her Miranda Right to an attorney was strictly routine background information questions conducted on behalf of ... Detective Sergeant Austin and there were no

questions whatsoever during that period of time on the substantive matter. It was very clear that ... Elizabeth then of her own free will, with no coercion or inducement whatsoever by Austin, agreed to talk and in fact, volunteered to tear up her former statement and sign a new one and did so. So the motion to suppress on the issue of voluntariness is denied.

(S.R. 94). At trial, defendant renewed her objection to the admission of the video taped confession. The trial court overruled the objection.

▋ Defendant contends that her video taped confession was inadmissible because Sgt. Austin did not cease interrogation after she requested an attorney. The Fifth and Fourteenth Amendments to the United States Constitution secure each citizen the right to the presence and advice of counsel during custodial interrogation by the police. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Once a suspect asserts the right to counsel, the interrogation must cease until counsel has been made available or until the suspect initiates further communication with the police and knowingly, intelligently and voluntarily waives the right to counsel which was previously invoked. *Oregon v. Bradshaw*, 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983); *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981).

▋ The decision whether to admit a confession is within the discretion of the trial judge. *Jones v. State*, 655 N.E.2d 49, 56 (Ind.1995). Admission of a confession into evidence is conditioned upon the State proving beyond a reasonable doubt that the defendant knowingly and intelligently waived his or her rights not to incriminate himself or herself and to have the presence of counsel during questioning. *Collins v. State*, 509 N.E.2d 827, 830 (Ind.1987). When reviewing a challenge to a trial court's decision to admit a confession we examine the record for substantial, probative evidence of voluntariness; we do not reweigh the evidence. *Id.* Review of defendant's video taped confession reveals that the following course of events occurred. Sgt. Austin entered the room and read defendant her *Miranda* rights from a preprinted form. Sgt. Austin stated: "Are you willing to talk to me at this time?" Defendant responded: "I can't afford a lawyer, but I would like one." Sgt. Austin stated: "Can't get that done for you 'till tomorrow. O.K.?" Defendant responded: "Uh huh." The questioning that continued was strictly limited to routine administrative and background questions that Sgt. Austin needed to ask to fill out the pre-printed form that indicated defendant had been advised of her rights, chose not to waive them, and requested an attorney. When Sgt. Austin offered to call someone for defendant, defendant requested that her parents be called. Sgt. Austin informed defendant that her initial hearing would be the next day, that an attorney would be appointed following the hearing, and that she should notify jail personnel if she decided to waive her rights and give a statement without counsel.

After Sgt. Austin confirmed that she would call defendant's parents, the following exchange occurred:

Sgt. Austin: If you wish to talk to me, I will be glad to come back.

Defendant: Uh Huh.

Sgt. Austin: I brought you up here to get you out of that down there.

Defendant: Uh Huh.

Sgt. Austin: I know that isn't very pleasant.

Defendant: Yeah.

Sgt. Austin: Any question other than your cold?

Defendant: Uh. Uh. I guess not. Uh, maybe I should talk to you anyway.

Sgt. Austin: You can talk to me. I will be glad to listen to you.

Defendant: Maybe I should just answer your questions.

Sgt. Austin: I can't advise you.

Defendant: I know. I know you can't.

Sgt. Austin: That's a decision you have to make.

After a brief exchange during which defendant indicated that she did not wish to talk to her parents when Sgt. Austin called them, defendant stated: "Let's start over." Sgt.

Austin responded: "O.K." Sgt. Austin then advised defendant of her *Miranda* rights, and defendant tore up the first waiver of rights form that she had signed. Upon indicating that she understood her rights, defendant signed a second waiver of rights and confessed to killing Phillips.

From this review of defendant's video taped confession, we believe the trial court could conclude that the state met its burden of proving beyond a reasonable doubt that defendant knowing and intelligently waived her right not to incriminate herself and to have the presence of counsel during questioning. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the video tape into evidence.

### IV

The trial court imposed the maximum sentence available, sixty years.[7] The trial court found one mitigating factor—"the defendant has led a law abiding life for her entire life, until this crime was committed. And there was no evidence of any prior crimes committed by Miss Mayberry." (R. 1190). However, the trial court found that this mitigating factor was significantly outweighed by the following aggravating factors: (1) defendant carefully planned the murder; (2) defendant killed Phillips in front of his church congregation; (3) imposition of a reduced sentence would depreciate the seriousness of the crime; (4) defendant was in need of correctional and rehabilitative treatment that could best be provided in a penal facility; (5) defendant killed Phillips in front of his daughter.

■ Defendant contends that the imposition of a sixty year sentence was manifestly unreasonable because the trial court utilized improper aggravating circumstances and abused its discretion in failing to find the existence of a significant mitigating circumstance. Making sentencing determinations is within a trial court's discretion, *Sims v. State*, 585 N.E.2d 271, 272 (Ind.1992), and is regulated by Indiana Code § 35–38–1–7.1 (1993). This statute includes a list of aggravating factors that justify increasing a pre-

sumptive sentence. Ind.Code § 35–38–1–7.1(b) (1993). It also permits the trial court to use other relevant aggravating and mitigating circumstances. Ind.Code § 35–38–1–7.1(d) (1993). Although a trial court must consider all evidence of mitigating factors that a defendant presents, a finding that a significant mitigating factor exists is within the trial court's discretion. *Harris v. State*, 659 N.E.2d 522, 528 (Ind.1995).

■ The Indiana Constitution confers upon this court the power to review and revise sentences. Ind. Const. art. VII, § 4. Indiana Appellate Rule 17(B) discusses this authority. Application of this rule requires a two step analysis. First, we look to see if the sentence seems to be disproportionate, i.e., "manifestly unreasonable in light of the nature of the offense and the character of the offender." *Fointno v. State*, 487 N.E.2d 140, 145 (Ind.1986). Second, if we conclude that the sentence may be manifestly unreasonable, we decide whether "no reasonable person could find such sentence appropriate to the particular offense and offender." *Id.* If, using this standard, we find a sentence inappropriate, we will revise it to make it reasonable. *Barany v. State*, 658 N.E.2d 60, 67 (Ind.1995).

■ We find two of the aggravating circumstances cited by the trial court inappropriate for use here. First, the trial court found the statutory aggravating circumstance "that imposition of a reduced sentence would depreciate the seriousness of the crime." Ind.Code § 35–38–1–7.1(b)(4) (1993). This aggravating factor is only used to support a refusal to reduce the presumptive sentence. *Ector v. State*, 639 N.E.2d 1014, 1015 (Ind. 1994), *citing Evans v. State*, 497 N.E.2d 919, 923 (Ind.1996). There is nothing in the record indicating that the trial court was considering a reduced sentence. Therefore, the use of this aggravating circumstance was improper.

■ Second, the trial court found the statutory aggravating circumstance that "defendant was in need of correctional and rehabilitative treatment that could best be provided in a penal facility." There was, of course,

---

7. The presumptive sentence for murder is forty years. Ind.Code § 35–50–2–3 (1993).

no question but that defendant would be incarcerated in a penal facility; the issue here is whether the defendant should be incarcerated for more than the presumptive term. Thus, for this aggravating circumstance to justify in part an enhanced sentence, it must be understood to mean that the defendant is in need of correctional and rehabilitative treatment that can best be provided by a period of incarceration in a penal facility in excess of the presumptive sentence term. The trial court gave no specific or individualized statement of the reason why this defendant was in need of correctional and rehabilitative treatment that could best be provided by a period of incarceration in a penal facility in excess of the presumptive sentence term. *Cf. Robey v. State,* 555 N.E.2d 145, 150–51 (Ind.1990) (discussing requirement of a specific and individualized statement of the reasons supporting an enhanced sentence). The other aggravating circumstances found by the trial court are sufficient to justify an enhanced sentence. However, we do not think that the trial court adequately weighed aggravating circumstances against significant mitigating circumstances.

 Here, the record shows that defendant invited the trial court to consider the fact that she was mentally ill at the time she committed the crime as a mitigating factor. The trial court expressly declined, finding that defendant's mental illness was not a mitigating factor under all the circumstances of this case. We disagree. The record shows that two of the four psychiatrists who testified, one of whom was court appointed, testified that defendant was mentally ill at the time she committed the crime. Moreover, the jury also thought defendant was mentally ill at the time of her crime as evidenced by its returning a verdict of guilty but mentally ill. In the face of this evidence of defendant's mental illness, we think the trial court abused its discretion by refusing to find mental illness as a significant mitigating factor. When we consider defendant's mental illness and the mitigator recognized by the trial court—that defendant had led a law abiding life up to her commission of this crime and there was no evidence that she had committed prior crimes—we do not think

the aggravating circumstances so substantially outweigh mitigating circumstances that enhancement of the presumptive sentence for murder is justified.

### Conclusion

Accordingly, defendant's conviction is affirmed and we remand this case to the trial court for imposition of the presumptive sentence for murder of forty years.

DeBRULER and DICKSON, JJ., concur.

SELBY, J., concurs in result without separate opinion.

SHEPARD, C.J., concurs except as to the sentence, believing that some enhancement of the sentence is warranted.