**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 25 2014, 9:16 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CHARLES P. DARGO**
Demotte, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| FRANCISCO VILLEGAS, JR., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 56A03-1402-CR-59 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE NEWTON SUPERIOR COURT
The Honorable Daniel J. Molter, Judge
Cause No. 56D01-1210-MR-1

**September 25, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Francisco Villegas, Jr., appeals following his convictions for Murder,[1] a felony, and Neglect of a Dependent,[2] a class D felony. Villegas raises a number of arguments, which we reframe and summarize as follows: (1) the trial court erroneously denied two of Villegas's juror challenges for cause; (2) the trial court erroneously admitted certain evidence; (3) the trial court erroneously excluded certain testimony by Villegas's expert witnesses; (4) the trial court erroneously instructed the jury on the issue of intent; and (5) the evidence is insufficient to support the convictions. Finding no reversible error, we affirm.

FACTS[3]

In the spring of 2012, Villegas began dating Kandi Armstrong, who had three children: four-year-old A.A., three-year-old K.A., and thirteen-month-old C.A. Villegas often babysat for Armstrong's children while she was at work.

On October 24, 2012, Villegas agreed to babysit for Armstrong's children in the evening. Around 3:00 p.m. that afternoon, Armstrong and the children visited Villegas at his home. Michael Shead was also present, and observed that C.A. did not have any visible injuries at that time. Around 3:30 p.m., Armstrong and the children went to her parents' residence, where Armstrong's mother bathed C.A. and changed his clothes. C.A. was uninjured at that time.

---

[1] Ind. Code § 35-42-1-1.

[2] Ind. Code § 35-46-1-4.

[3] We remind counsel for Villegas that Appellate Rule 46(A) requires that the facts be stated in accordance with the appropriate standard of review and that the statement of facts "shall be in narrative form and shall not be a witness by witness summary of the testimony." Ind. Appellate Rule 46(A)(6)(c).

Armstrong spent the evening with Eric Adams, a friend of Villegas. On her way to pick up Adams, Armstrong saw Pat Whaley, another friend of Villegas, and was concerned that Whaley would tell Villegas that she was out with someone else. Armstrong called and texted Villegas, who told her that he was not angry. While Adams and Armstrong were eating dinner, Villegas called Adams eight times and texted him three times. Adams turned the ringer off of his phone and was worried for Armstrong's safety following the date.

During that period of time, Villegas had gone to a bar, shot pool, and consumed alcohol. After he returned home, he spoke to Armstrong on the phone, and they exchanged "hard words," with Villegas behaving in an upset and angry manner. Tr. p. 224-25.

Around 7:00 p.m., Armstrong's stepfather and sister were with C.A., who was uninjured and behaving normally at that time. Armstrong's sister took C.A. to Villegas's residence. She could tell that Villegas had been drinking alcohol and could see beer bottles "all over" the place. Id. at 357-58. C.A. cried and did not want to stay with Villegas; Villegas pushed C.A. behind him and told Armstrong's sister that he would be fine. When C.A. was left with Villegas, he was uninjured.

At 8:30 p.m., Armstrong's two other children returned from church, and her stepfather walked them over to Villegas's residence. Villegas came to the porch and said that C.A. was asleep in bed. At approximately 9:00 p.m., Villegas telephoned his estranged wife, Jessica Villegas, who lives out of state, and told her that somebody was

3

half dead in the driveway. She offered to call the police and he told her not to. Jessica did not believe him and "blew [] off" the phone call. Id. at 199.

At approximately 10:30 p.m., Villegas appeared at the residence of Armstrong's parents with an unresponsive and naked C.A. in his arms. Armstrong's parents observed bruising all down the left side of C.A.'s face and body. At about the same time, Armstrong and Adams were driving home after they had seen a movie. Villegas had tried to call Armstrong seven times during the movie, and her stepfather had called her as well. When she called her stepfather, he told her that C.A. was dead. She told her stepfather to call 911 and drove to the residence; he was speaking with the 911 dispatcher when she arrived. Armstrong observed extensive bruising to C.A.'s face and chest and noticed that his skin was blue.

Newton County Sheriff's Deputy Jason Krug and Brook Town Marshal Chip Flahive responded to the scene. Deputy Krug and Marshal Flahive both observed that C.A. was lifeless, had extensive bruising, was the color blue, and was cold to the touch. C.A. was transported to a hospital, but all lifesaving efforts on scene and at the hospital were unsuccessful and C.A. was declared dead at 11:55 p.m.

Outside his residence, Villegas signed a waiver of his rights and gave a brief statement to Deputy Krug. Villegas stated that he had put C.A. in the bathtub and left the bathroom, and when he returned to check on C.A., the toddler was under the water and not breathing. Villegas hit him on the back a couple of times and then went across the street for help.

4

On October 26, 2012, Pathologist Allen Griggs performed C.A.'s autopsy. The autopsy revealed that C.A. had sustained multiple blunt force injuries, including bruises and abrasions, to his head, ears, face, chest, abdomen, arms, and leg. On the side, back, and top of his head, C.A. had sustained bruising under his scalp. C.A. had also sustained a blunt force injury that lacerated his liver in two, causing him to bleed approximately half of his blood volume into his abdominal cavity; the same trauma that damaged the liver also likely caused bruising to his pancreas. These abdominal injuries would have required "great force" equal to a car accident or being stomped on the abdomen with a foot or knee. Id. at 316-17.

C.A. had a cluster of bruises in a semicircle on the left side of his abdomen that looked like knuckles or a fist, which could have caused the liver injury. C.A. also sustained a contusion to his left forearm and an abrasion to the tip of his penis. Dr. Griggs found a large group of bruising to the left side of C.A.'s head, a small group to the left rear of his head, and another, larger group to the top back of his head. These three injuries were all the same size—about an inch in diameter and with circular beading, demonstrating that C.A. was struck by or against the same object three different times and in three different places on his head. The object could have been the bottom of a beer bottle. Dr. Griggs concluded that these injuries caused his brain to swell and herniate within a short period of time, which was the primary cause of his death. All of C.A.'s acute injuries were caused close in time to his death.

5

Dr. Griggs opined that the manner of death was homicide. Dr. Griggs also concluded that the injuries could not have been caused by a fall down the stairs or by a game of "helicopter" in which C.A. was swung around, unless he struck the same object three different times on three different areas of his head. There were no carpet fibers, gravel, or dirt in any of C.A.'s injuries, and there was no evidence that C.A. had drowned.

DNA testing showed C.A.'s blood on various items in Villegas's bedroom: Villegas's t-shirt, C.A.'s shirt, the carpet, the bed sheet, and two locations on the wall near the bed, as well as the edge of the bathtub. No blood or other evidence was found on Villegas's carpeted stairs, nor was any kind of circular object found on the stairs to explain the multiple, circular injuries on C.A.'s head.

On or about October 24, 2012, Villegas was arrested and incarcerated. On October 25, 27, and 28, Villegas made statements to police officers, but had previously invoked his right to counsel. Those statements were eventually suppressed by the trial court. On October 30, 2013, Villegas asked jail staff to set up a meeting for him with Detective Dustin Gary. Detective Gary read Villegas his rights and provided him with a written copy; Villegas signed a waiver of those rights and proceeded to make a statement. Villegas told Detective Gary that C.A. first fell down the stairs, and then fell in the bathtub. Then, Villegas took him outside, where C.A. fell off the porch. C.A. was acting cranky, so Villegas played helicopter with him, and during the game of helicopter, C.A. struck his head, possibly on the door jamb. Villegas returned C.A. to the bathtub, where

6

C.A. vomited, and Villegas then left the bathroom. When he returned, C.A. was unconscious. Villegas then carried the boy across the street, falling on the driveway or porch on his way.

On October 31, 2012, the State charged Villegas with murder, class A felony neglect of a dependent resulting in death, and class D felony obstruction of justice.[4] On December 13, 2013, the trial court denied Villegas's motion to suppress the October 30 statement made to Detective Gary. During voir dire, the trial court denied Villegas's request to dismiss two potential jurors for cause.

Villegas's jury trial took place on December 16 through 21, 2013. Following the trial, the jury found Villegas guilty as charged. At the January 17, 2014, sentencing hearing, the trial court reduced the class A felony neglect conviction to a class D felony. The trial court sentenced Villegas to sixty years for murder and to three years, suspended, for the neglect conviction. Villegas now appeals.

### DISCUSSION AND DECISION

Villegas argues as follows: (1) the trial court erroneously denied two of Villegas's juror challenges for cause; (2) the trial court erroneously admitted certain evidence; (3) the trial court erroneously excluded certain testimony by Villegas's expert witnesses; (4) the trial court erroneously instructed the jury on the issue of intent; and (5) the evidence is insufficient to support the convictions.

---

[4] The State dismissed the obstruction of justice charge on December 12, 2013.

## I. Strikes for Cause

First, Villegas argues that the trial court erroneously denied his request to strike two prospective jurors for cause. As a general rule, whether a particular juror should be excused for cause rests within the trial court's sound discretion, and we will not reverse unless we find an abuse of that discretion. Ward v. State, 908 N.E.2d 595, 597 (Ind. 2009). We afford substantial deference to the trial court on this issue because the trial court sees prospective jurors firsthand and is in a far better position to assess a juror's ability to serve without bias and reach a decision based on the law. Fox v. State, 717 N.E.2d 957, 961-62 (Ind. Ct. App. 1999).

As to the first prospective juror challenged by Villegas ("Juror A"), after the trial court denied his request to strike her for cause, Villegas used a peremptory challenge to have her removed as a juror. Because Juror A did not sit on the final jury that decided Villegas's guilt, it is irrelevant whether the trial court erred in denying the challenge for cause. Ward, 908 N.E.2d at 954-55. Villegas argues that he was prejudiced because, having used one of his peremptory strikes for Juror A, he was later forced to accept his second challenged juror ("Juror B") after the trial court denied his request to have Juror B removed for cause. Our Supreme Court has rejected this precise argument, however, concluding that a defendant may not claim reversible error "premised on the trial court's failure to grant his challenges for cause with respect to jurors he later removed by peremptory challenge." Id. at 955 (applying Ross v. Oklahoma, 487 U.S. 81 (U.S. 1988)). Instead, "the issue of whether the defendant had an impartial jury must focus on

8

one or more of the jurors who actually sat and rendered the decision." Id. at 954-55. We find no reversible error, therefore, with respect to Juror A.

Turning next to Juror B, Villegas argues that the trial court erred by denying his request to have this prospective juror struck for cause. At the time the trial court denied the request to strike for cause, Villegas had two remaining peremptory challenges. Villegas used the two remaining peremptory challenges on other prospective jurors and did not remove Juror B. Our Supreme Court has held as follows:

> To preserve for appeal a claim that the trial judge erred in denying a challenge for cause, the defendant must demonstrate that he or she either used a peremptory challenge to remove the challenged juror or had already exhausted his or her allotment of peremptories. It is not sufficient that peremptories are eventually exhausted if such challenges were available when the for-cause challenge was denied but the juror was not struck.

Whiting v. State, 969 N.E.2d 24, 30 (Ind. 2012) (internal citations and footnote omitted) (emphasis original). As further explained by the Whiting Court, "[i]f the trial court refuses to remove the juror for cause and the defendant chooses not to remove the juror peremptorily, then there is a fairly strong indication that the parties who viewed the whole picture did not consider the juror sufficiently biased to warrant removal." Id. at 31. Here, Villegas had two remaining peremptory challenges when the trial court denied his request to have Juror B struck for cause, but declined to use the peremptories on Juror B. Therefore, he has not preserved this claim for appeal and it is unavailing.

9

## II. Admission of Evidence

Next, Villegas contends that the trial court erred in admitting the following evidence: (1) testimony of Detective Gary regarding Villegas's October 30 statement; (2) testimony of Jessica regarding a past occasion when Villegas battered her boyfriend in a jealous rage; (3) testimony of Dr. Griggs on recall; and (4) rebuttal testimony by Marshal Flahive.

The admission of evidence at trial is a matter left to the discretion of the trial court. Clark v. State, 994 N.E.2d 252, 259-60 (Ind. 2013). We review these determinations for abuse of that discretion, and will reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. Id. at 260.

### A. Detective Gary's Testimony

Villegas argues that the trial court erred in permitting Detective Gary to testify about the October 30 statement. See id. at 259 (holding that direct review of the denial of a motion to suppress is proper only when the defendant files an interlocutory appeal, so an appeal on this issue following trial is best framed as a challenge to the admission of the evidence at trial). Specifically, he contends that because he had previously invoked his right to counsel, his statement to Detective Gary should not have been admitted.

The Fifth and Fourteenth Amendments to the United States Constitution secure each citizen the right to presence and advice of counsel during custodial interrogation by the police. Mayberry v. State, 670 N.E.2d 1262, 1269 (Ind. 1996) (citing Miranda v.

Arizona, 384 U.S. 436 (1966)). Therefore, when an individual in custody invokes his right to counsel, all interrogation must cease until an attorney is present. Hartman v. State, 988 N.E.2d 785, 788 (Ind. 2013). An exception to the general rule exists, however, if the defendant is the one who initiates further interrogation. Therefore, if the individual initiates "further communication, exchanges, or conversations" with law enforcement after invoking the right to counsel, then the individual may be further interrogated without counsel present. Id. The accused must then knowingly, intelligently, and voluntarily waive the previously asserted right to counsel for the interrogation to proceed. Mayberry, 670 N.E.2d at 1269.

Villegas concedes that he initiated the contact with police on October 30 by asking jail staff to set up a meeting with Detective Gary. Furthermore, he does not contest that at the beginning of his interview with Detective Gary, he was provided with a written copy of his rights, nor does he deny that those rights were read to him before he signed a form waiving those rights. He argues, instead, that his waiver was not voluntary.

Villegas emphasizes that in the five days leading up to October 30, he had been incarcerated and had not yet been able to speak with an attorney. Initially, we note that the police did not have a duty to provide Villegas with counsel. Duckworth v. Eagan, 492 U.S. 195, 204 (1989) (holding that "[i]f the police cannot provide appointed counsel, Miranda requires only that the police not question a suspect unless he waives his right to counsel"). During his five days of incarceration, Villegas was able to talk with friends and family. He also appeared in open court on October 26, 2012, during which the State

11

was granted seventy-two hours to file charges.[5] At the beginning of the October 30 interrogation, Detective Gary advised Villegas that he would be returning to court the following day. Therefore, Villegas had not been denied information about the status of the proceeding and he knew when he was next going to court and could request court-appointed counsel. Given that Villegas initiated the contact with police, had appeared in open court, had been permitted to have contact with family and friends, and had not been kept in the dark about the legal proceedings, we cannot find that his waiver of counsel was involuntary. Therefore, we do not find that the trial court erred by permitting Detective Gary to testify about the October 30 statement.[6]

Villegas next argues that the trial court erroneously permitted Detective Gary to give improper vouching testimony. No witness may "testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Ind. Evidence Rule 704(b).

Over Villegas's objection, the State was permitted to ask Detective Gary the following question:

---

[5] Although Villegas seems to argue that he should have been appointed a public defender at the October 26 hearing, he does not actually raise the issue on appeal. And the fact that the court did not provide him with court-appointed counsel at that time does not change the fact that the police had no obligation to do so.

[6] Even if we had found the admission of this testimony erroneous, it would not change our outcome herein. The October 30 statement merely consisted of Villegas recounting his newest version of how C.A. had gotten injured on the night in question. There was other evidence in the record establishing Villegas's dishonesty regarding the events of that night, so this statement was merely cumulative. Therefore, any error in admitting this statement would have been harmless. See Kilpatrick v. State, 746 N.E.2d 52, 58 (Ind. 2001) (holding that any error in admitting evidence is harmless if the evidence is merely cumulative).

12

> Detective, based on your training and your three levels of Reed technique that you've been instructed in, and in your nearly two decades of experience as a police officer, do you believe that a story with one detail that evolves into a story with multiple details over time is deception?

Tr. p. 240. Detective Gary responded, "Yes." Id. It is well established that a hypothetical question that does not refer specifically to the people involved in the litigation is not improper vouching testimony. See Odom v. State, 711 N.E.2d 71, 78 (Ind. Ct. App. 1999). We find that this question was merely a hypothetical question that did not rise to the level of vouching testimony and that the trial court did not err by allowing the question to be asked and answered.

### B. Impeachment Testimony

Next, Villegas argues that the trial court impermissibly allowed the State to question Jessica about a past incident when he battered her boyfriend. On direct examination, Jessica testified regarding her relationship with Villegas and her communications with him on October 24. On cross-examination, defense counsel asked Jessica about her deposition testimony that Villegas was not a jealous person, and she affirmed that testimony. The State argued that defense counsel had opened the door to admission of Villegas's 2009 conviction for battery against Jessica's boyfriend. Specifically, the State contended that this evidence was admissible to impeach Jessica regarding her testimony that Villegas was not a jealous person. The trial court agreed but limited the evidence to impeach Jessica. In questioning her on the 2009 incident, the

13

State did not ask any questions about the conviction, and the jury never learned that Villegas had been convicted of the crime.

Our Supreme Court has held that evidence that is otherwise inadmissible may become admissible when the defendant opens the door to questioning on that evidence. Kubsch v. State, 784 N.E.2d 905, 919 n.6 (Ind. 2003). To open the door, the evidence relied upon must leave the factfinder with a false or misleading impression of the facts related. Ortiz v. State, 741 N.E.2d 1203, 1208 (Ind. 2001).

Here, the State's theory of motive was that Villegas found out that Armstrong was on a date with Adams and took his anger out on C.A. in a jealous rage. Villegas's cross-examination of Jessica left the jury with the misleading impression that Villegas was not a jealous person and would not react in that fashion. We find that the trial court did not err by permitting the State to impeach that testimony with evidence of Jessica's knowledge regarding Villegas's prior jealous actions.

### C. Dr. Griggs on Recall

Villegas next argues that the trial court erred by permitting the State to recall Dr. Griggs to correct an erroneous statement that he had made during his prior testimony. Earlier, Dr. Griggs had testified that the hospital records reflected that C.A.'s pupils were "dilated and of unequal size," which indicated he had sustained brain injury. Tr. p. 342. Dr. Griggs was then released from the witness stand. Following a brief recess, the State requested that it be permitted to recall Dr. Griggs, which the trial court permitted. Dr. Griggs clarified that in fact, the hospital records had showed that C.A.'s pupils were

14

equal, rather than unequal, in size. Tr. p. 350-51. Villegas is unable to articulate the harm he sustained as a result of this testimony. To the contrary, this corrected testimony helped, rather than harmed, his defense, because equal pupil size is not necessarily indicative of brain trauma. Villegas makes wholly unfounded and nonsensical allegations regarding witness coaching that we will not address. We find no error on this issue.

### D. Rebuttal Testimony by Marshal Flahive

Villegas also finds fault with rebuttal testimony provided by Marshal Flahive. During Villegas's case-in-chief, he called Chris Whaley to the stand. Whaley testified regarding a number of issues, including statements that he had made to Marshal Flahive. Among other things, Whaley testified that he had told the marshal that he did not want to be involved in this case. Tr. p. 370. The State recalled Marshal Flahive to rebut Whaley's testimony regarding Whaley's statements made during the investigation. All of Villegas's objections regarding hearsay and impermissible impeachment were sustained. In the end, the only substantive testimony that Marshal Flahive offered on rebuttal was that Whaley told him that he did not want to be involved. Inasmuch as this is wholly cumulative of what Whaley had testified to, we find neither error nor harm in this testimony.

### III. Exclusion of Portions of Expert Testimony

Next, Villegas argues that the trial court erroneously excluded certain portions of testimony he had hoped to elicit from his expert witnesses. Trial courts have broad latitude with respect to discovery matters and their rulings receive great deference on

15

appeal.  Cain v. State, 955 N.E.2d 714, 718 (Ind. 2011).  We will affirm absent clear error and resulting prejudice.  Morse v. Davis, 965 N.E.2d 148, 160 (Ind. Ct. App. 2012).

Villegas retained a pathologist, Dr. James Bryant, and a neurologist, Dr. Julian Ungar-Sargon.  In preparing their reports and reaching their conclusions, neither doctor was provided with the autopsy photographs.  The State deposed both witnesses approximately one month before trial, but did not question them about the autopsy photographs or any conclusions they may have drawn therefrom because they had not relied upon or been provided with those photographs.  At trial, Villegas attempted to question both witnesses about the autopsy photographs and conclusions they may have drawn therefrom.  The State objected, arguing that the State had not had the opportunity to cross-examine the witnesses regarding the autopsy photographs, nor had either doctor created an addendum to his report incorporating these photographs.  The trial court sustained the objection and limited both witnesses' testimony to the information they had been provided with before the depositions and the opinions they reached as a result of that information.

Indiana Trial Rule 26(E)(1) requires parties to supplement discovery responses with respect to the subject matter and substance of an expert witness's expected testimony in a timely fashion.  Here, Villegas failed to comply with this rule.  Under

16

these circumstances, we find that the trial court did not err by limiting their testimony to that which had been properly discovered.[7]

Next, Villegas argues that the trial court erred by refusing to permit Dr. Ungar to testify as to his opinion regarding C.A.'s cause of death. When Villegas initially retained Dr. Ungar, the trial court gave permission so that Dr. Ungar could evaluate Villegas's level of impairment at the time of the offense. Appellant's App. p. 248. At that hearing, Dr. Ungar testified that he would tender an opinion as to Villegas's level of impairment and ability to form intent. Id. at 396. One month before trial, Dr. Ungar issued his report, which indicated that he had also been asked by defense counsel to review and comment on C.A.'s pathology report. Dr. Ungar opined that C.A. may have died from the liver laceration rather than the brain trauma. The State deposed Dr. Ungar on November 26, 2012, two weeks before trial, to explore this new and unexpected area of his testimony. The State consulted with two neurologists following the deposition but was unable to find a neurologist who could generate a report in time for trial. On December 13, 2012, the State moved to exclude that portion of Dr. Ungar's testimony because it went beyond the limited purpose for which the trial court had authorized his retention as an expert. The trial court agreed and granted the motion.

In granting the motion, the trial court noted that Dr. Ungar had been retained to perform a neurological examination of Villegas, but was suddenly prepared to testify regarding C.A.'s cause of death. The trial court found that the State had been put "in a

---

[7] In any event, Villegas states that neither witness's opinion changed after he viewed the autopsy photographs. So even if there were error, it would be harmless.

17

terrible disadvantage" and that it found that Dr. Ungar—a pathologist, not a neurologist—was "given some documents" and "he's taken a shot at what he thinks the cause of death is" with "no real analysis." Tr. p. 379, 421. Given the unexpectedness of this testimony as well as the extremely late hour at which it was offered, we find that the trial court did not err in excluding it from trial.

## IV. Jury Instruction

Villegas next argues that the trial court erred by tendering a separate instruction to the jury on the issue of intent. In reviewing a trial court's decision to give a tendered jury instruction, we must determine whether the instruction (1) correctly states the law, (2) is supported by the evidence in the record, and (3) is not covered in substance by other instructions. Wal-Mart Stores, Inc. v. Wright, 774 N.E.2d 891, 893 (Ind. 2002). When an instruction is challenged as being covered in substance by other instructions, we defer to the trial court and will reverse only for an abuse of discretion. Id. at 893.

Here, the jury was provided with the statutory definition of "intentionally":

> A person engages in conduct "intentionally" if, when he engages in the conduct, it is his conscious objective to do so. If a person is charged with intentionally causing a result by his conduct, it must have been his conscious objective not only to engage in the conduct but also to cause the result.

Appellant's App. p. 501. Additionally, the jury was given another instruction that stated "[i]ntent for murder may be inferred from the severity, duration or brutality of the attack." Id. at 505. Villegas does not argue that this is an incorrect statement of the law;

18

instead, he argues that the substance of this latter instruction was covered by the former. We cannot agree.

No other instructions, including the one regarding the definition of "intentionally," instructed the jury that it could infer intent from the evidence. In his two-sentence argument on this issue, Villegas does not explain how the latter instruction is duplicative, nor does he argue that he was prejudiced as a result of the instruction. We also note that this Court has held that intent instructions of this nature do not impermissibly highlight a certain piece of evidence. Reese v. State, 939 N.E.2d 695, 701 (Ind. Ct. App. 2011). We can only conclude that this instruction was a correct statement of the law, the evidence supported the instruction, and it was not covered by other instructions. We find no error on this basis.

## V. Sufficiency of the Evidence

Finally, Villegas argues that the evidence is insufficient to support his convictions. When we review a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor assess witness credibility. McClellan v. State, 13 N.E.3d 546, 548 (Ind. Ct. App. 2014). Instead, we consider only the probative evidence supporting the conviction and the reasonable inferences to be drawn therefrom. Id. If there is substantial evidence of probative value from which a reasonable factfinder could have drawn the conclusion that the defendant was guilty beyond a reasonable doubt, then the verdict will not be disturbed. Id. To convict Villegas of murder, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally killed C.A., another human being.

19

I.C. § 35-42-1-1.  To convict Villegas of class D felony neglect of a dependent, the State was required to prove beyond a reasonable doubt that he had the care of C.A., a dependent, and knowingly or intentionally placed C.A. in a situation that endangered his life or health.  I.C. § 35-46-1-4(a).

The record reveals that Villegas had sole care of C.A. on the night he died and that C.A. was uninjured and in good health when Villegas assumed that care.  Additionally, Villegas was very upset and angry with Armstrong because she was on a date with someone else.  During the hours after Villegas assumed care of C.A., the infant sustained three significant injuries of a circular nature to three different parts of his head, a significant injury to his abdomen that caused his liver to lacerate in two and bruised his pancreas, and extensive bruising and blunt force injuries covering nearly his whole body.  The abdominal injuries would have required "great force" equal to a car accident or being stomped on the abdomen with a foot or knee.  Tr. p. 316-17.  C.A.'s blood was found in multiple areas of Villegas's bedroom and bathroom. There was no blood on the stairs, however, suggesting that the child had not fallen down the stairs as claimed by Villegas, nor were any carpet or fiber debris found on the child's body.

Two expert witnesses testified that in their opinion, the primary cause of C.A.'s death was closed head trauma resulting from blunt force trauma to three areas of his head, causing his brain to swell and herniate within a short period of time.  The injuries suggested that C.A. was struck by or against the same object three different times and in three different places.  Dr. Griggs opined that the manner of C.A.'s death was homicide,

20

based on the age and dissemination of the bruising to C.A.'s body. Further, Dr. Griggs testified that it was "highly unlikely" that the injuries to C.A.'s head or liver were caused by a fall down the stairs. Tr. p. 318, 323, 337, 340.

Villegas provided varying accounts of how C.A. sustained his injuries. At first, he claimed merely that C.A. had drowned in the bathtub. Then, he stated that C.A. had fallen in the bathtub. Then, he stated that C.A. had fallen in the bathtub, then fallen down the stairs, then struck his head during a game of helicopter, then fallen in Villegas's arms. There was no evidence establishing that C.A. drowned, and there was expert testimony establishing that the child could not have sustained his multiple, severe injuries in the manner described by Villegas. We find that there is ample evidence in the record supporting Villegas's convictions and decline to reverse on this basis.

The judgment of the trial court is affirmed.

KIRSCH, J., and ROBB, J., concur.